# United States Court of Appeals
## For the First Circuit

No. 17-1517

K.L., THROUGH HER PARENT L.L. ON BEHALF OF A CLASS OF THOSE
SIMILARLY SITUATED

Plaintiff, Appellant,

v.

RHODE ISLAND BOARD OF EDUCATION; BARBARA S. COTTAM,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, <u>Chief U.S. District Judge</u>]

Before

Lynch and Lipez, <u>Circuit Judges</u>,
Ponsor, <u>District Judge</u>.[*]

Jason H. Kim, with whom <u>Sonja L. Deyoe</u> and <u>Paul Aston</u> were on
brief, for appellant.
<u>Paul Sullivan</u> for appellees.

October 29, 2018

[*] Of the District of Massachusetts, sitting by designation.

**LIPEZ**, **Circuit Judge**.  This case involves the alleged failure of Rhode Island to provide a free appropriate public education ("FAPE") to qualified students with disabilities, as required by the Individuals with Disabilities Education Act ("IDEA"). Specifically, K.L., through her parent L.L., and on behalf of a certified class of those similarly situated, asserts that Rhode Island violates the IDEA because it provides "public education" to individuals without disabilities between the ages of 21 and 22, but does not provide special education services to qualifying individuals with disabilities of the same age.

At the core of this dispute is the meaning of "public education" in a section of the IDEA specifying that a state need not provide FAPE to qualified students aged 18 through 21 if doing so "would be inconsistent with State law or practice . . . respecting the provision of public education."  20 U.S.C. § 1412(a)(1)(B)(i).  The IDEA does not define "public education," and we have not previously interpreted the phrase.  The district court concluded that the adult education programs Rhode Island provides to non-disabled students beyond the age of 21 do not constitute "public education" within the meaning of the IDEA, and, therefore, Rhode Island does not discriminate against students with disabilities by failing to provide FAPE to qualifying students of the same age.

We disagree with the district court's narrow interpretation of the term "public education." Accordingly, we vacate the decision of the district court and remand the case for entry of judgment in favor of K.L. and for remedial proceedings consistent with this opinion.

## I. Procedural History

K.L.'s original complaint and amended complaint were filed on her own behalf and on behalf of a class of those similarly situated. The district court granted K.L.'s motion for certification of a statewide class that includes

> [a]ll individuals who were over 21 and under 22 within two years before the filing of this action or will turn 21 during the pendency of this action who are provided or were provided a FAPE under the IDEA by any [Local Education Agency] in the State of Rhode Island and who, but for turning 21, would otherwise qualify or would have qualified for a FAPE until age 22 because they have not or had not yet earned a regular high school diploma ("the Class").

Following certification, the parties filed cross-motions for summary judgment. The district court determined that the only significant factual dispute concerned "the degree of public supervision the Rhode Island Department of Education ("RIDE") exercises over the state's adult education programs." Concluding that this dispute was immaterial to the scope of the term "public education," the court granted summary judgment for appellees on the basis of its holding that Rhode Island's "adult education"

- 3 -

services do not qualify as "public education" within the meaning of the IDEA.

In this appeal, K.L. argues that, for purposes of the IDEA, "public education" includes the adult education services Rhode Island provides to persons up to age 22. Accordingly, she argues that the IDEA obliges the state to provide FAPE to students with disabilities up to age 22, which Rhode Island does not currently do.

We review de novo the district court's ruling on the parties' cross-motions for summary judgment. See AES P.R., L.P. v. Trujillo-Panisse, 857 F.3d 101, 110 (1st Cir. 2017). In assessing the competing views of Rhode Island's obligation, we begin by determining the meaning of "public education" as used in the IDEA. We then consider whether Rhode Island's adult education services constitute "public education" within that meaning.

**II. The Individuals with Disabilities Education Act**

**A. The Meaning of "Public Education"**

The IDEA requires states to provide "[a] free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21, inclusive[.]" 20 U.S.C. § 1412(a)(1)(A). Pursuant to this mandate, all students "who are [otherwise] eligible for special education services are entitled to continue receiving those services until they turn twenty-two." L.A. Unified Sch. Dist. v.

_Garcia_, 669 F.3d 956, 959 (9th Cir. 2012); see also St. Johnsbury Acad. v. D.H., 240 F.3d 163, 168-69 (2d Cir. 2001). Notwithstanding this general requirement, the IDEA permits an exception to the applicable age range: "[t]he obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children . . . [aged] 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to [such] children[.]" 20 U.S.C. § 1412(a)(1)(B)(i).

In assessing the meaning of the phrase, "inconsistent with State law or practice," the Ninth Circuit examined the IDEA's legislative history. See E.R.K. ex rel. R.K. v. Haw. Dep't of Educ., 728 F.3d 982, 986–87 (9th Cir. 2013). Citing the Senate Report accompanying the 1975 statute that first created the exception, the Ninth Circuit held that § 1412(a)(1)(B)(i) means that a state may only deny FAPE to students with disabilities ages 18 through 21 to the extent it also abstains from providing "public education" to students without disabilities of the same ages. See id. at 987 (quoting S. Rep. No. 94–168, 1975 U.S.C.C.A.N. 1425, 1442–43 (1975) (explaining that the "exception shall not apply . . . where a state does now in fact provide or assure the provision of free public education to non-handicapped children in these age groups")). We agree with this interpretation of

- 5 -

§ 1412(a)(1)(B)(i). Appellees do not challenge it. Therefore, a state's provision of "public education" for students from age 18 through age 21 triggers the IDEA's § 1412(a)(1)(A) FAPE mandate for students with disabilities in the same age range.

The IDEA, however, does not include "public education" among the three dozen terms for which the statute provides definitions. See 20 U.S.C. § 1401. We infer from that absence Congress's recognition that "public education" has a commonly understood meaning accessible to courts if they must resolve disputes involving the meaning of that phrase. See United States v. Chuong Van Duong, 665 F.3d 364, 366 (1st Cir. 2012) ("We assume that the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress's intent." (quoting Boivin v. Black, 225 F.3d 36, 40 (1st Cir. 2000)); In re Hill, 562 F.3d 29, 32 (1st Cir. 2009) (same). Appellees agree that the term "public education" should "carr[y] its ordinary meaning," and, indeed, this ordinary meaning assumption is a rule of necessity. Faced with a case that turns on the meaning of an undefined statutory term, we cannot decline to decide the lawsuit because Congress failed to provide a definition. Instead, we draw on our awareness of ordinary usage, as Congress would have understood it.

We begin with the two core attributes of "public education" that are undisputed: (1) a significant level of state

or local governmental funding, and (2) the public administration or oversight of the educational services. Although appellees advocate for a narrower conception of "public education" under the IDEA, see infra Section II.B, they acknowledge that "public education" is education that is "subject to and meeting state standards" and provided "at public expense."

The view that "public education" is commonly understood to involve government funding and administration or oversight is confirmed by our review of multiple dictionary definitions. Although dictionaries are not dispositive in interpreting statutory language, they provide useful guidance on the common meaning of words and phrases. United States v. Lachman, 387 F.3d 42, 51 (1st Cir. 2004) ("Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations."); see also, e.g., Wis. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2071 (2018); Voisine v. United States, 136 S. Ct. 2272, 2278 (2016). In this instance, for example, the Oxford English Dictionary, considered "one of the most authoritative on the English language," Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2003 (2012), defines public education, in relevant part, as "education provided by the State," Oxford English Dictionary, http://www.oed.com (2018); see also The Oxford English Dictionary 780 (2d ed. 1989) (stating that "public"

means, inter alia, "provided or supported at the public expense, and under public control: as in *public elementary school*").

Similarly, while the Random House Dictionary of the English Language does not contain an entry for "public education," it defines "public" as being "maintained at the public expense and under public control," and it defines "public school" as a place "maintained at public expense for the education of the children of a community or district and that constitutes a part of a system of free public education commonly including primary and secondary schools." The Random House Dictionary of the English Language 1562-63 (2d ed. 1987); see also Random House Webster's Unabridged Dictionary 1562-63 (2d ed. 1997) (same). Ultimately, while exact language is bound to differ among dictionaries, we find helpful the shared dictionary focus on state funding and a degree of state control for the confirmation it offers of our understanding of the ordinary meaning of "public education."

Moreover, these two attributes are consistent with the IDEA's definition of the related term "free appropriate public education" -- the educational guarantee at the heart of the statute. See Hernández-Miranda v. Empresas Díaz Massó, Inc., 651 F.3d 167, 171 (1st Cir. 2011) ("To determine ordinary meaning, we may consult dictionary definitions . . . and the statutory context in which the words are used."). The FAPE contemplated by the statute is "provided at public expense, under public supervision

- 8 -

and direction." 20 U.S.C. § 1401(9)(A).[1] Therefore, the IDEA's definition of FAPE is consistent with the two core attributes of a "public education" that we identify.[2]

In one respect, however, we must supplement this ordinary understanding of "public education" with an additional attribute discernable from the way in which the IDEA uses the phrase. The two core attributes we have identified could apply to education at all levels, including post-secondary schooling. Yet "public education" in the context of the IDEA is limited to

---

[1] The full definition of FAPE is as follows:

> The term "free appropriate public education" means special education and related services that --
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

[2] In E.R.K., the Ninth Circuit also grappled with the IDEA's lack of a definition for "public education," and it extracted a meaning for that term from the definition for "free appropriate public education." See 728 F.3d at 987-88. We are unpersuaded by that analysis, which uses FAPE, a term of art that applies to "special education and related services," 20 U.S.C. § 1401(9), to define the general term "public education." We look to the FAPE definition only in the limited way noted above.

educational opportunities only through the academic level associated with completion of secondary school. We see this endpoint in multiple provisions. For example, the IDEA defines a type of services called "transition services" as activities designed "to facilitate [a child with a disability's] movement from school to post-school activities, including post-secondary education[.]" 20 U.S.C. § 1401(34). The definition of "transition services" implies that "public education" within the meaning of the IDEA includes only education up through a "secondary education." Similarly, the IDEA defines FAPE as including "an appropriate preschool, elementary school, or secondary school education." 20 U.S.C. §1401(9)(C). Since providing "public education" triggers the FAPE requirement, it is logical that the two terms apply to the same levels of schooling. We find further confirmation of this scope in the IDEA's statement of purpose, which likewise uses terminology commonly associated with secondary-level achievement: "educational outcomes," § 1400(c)(9), "educational results," § 1400(d)(3), and "graduation rates," § 1400(c)(14).

Accordingly, beyond the two attributes of "public education" at the core of that term's ordinary usage -- public funding and public administration or oversight -- "public education" within the meaning of the IDEA includes the objective of educating students up to the level of academic proficiency

associated with the completion of secondary school.  Appellees do not dispute that these three attributes characterize "public education" within the meaning of the IDEA.  However, they insist that an additional limitation applies.

## B. "Traditional Public Schools"

Specifically, appellees contend that the ordinary meaning of "public education" is limited to education that is provided at "traditional public schools."  They state that "'public education,' as used in the applicable IDEA limitation section, is not separate from traditional public schools, but instead refers to traditional, standards-based public school education."  Since the educational services at issue in this case are not delivered at "traditional public schools," appellees claim that those services are not "public education" within the meaning of the IDEA.[3]

Appellees support their narrow reading of "public education" by invoking various provisions of state and federal law in a fashion that is incompatible with the IDEA's "wide-ranging remedial purpose intended to protect the rights of children with

---

[3] We note that appellees do not cite any support, legal or otherwise, for their concept of a "traditional public school[]" that provides a distinct method of educating students.  Indeed, we think it a matter of general knowledge that public school programs have long included non-traditional educational formats, including vocational or employment-related activities and opportunities to earn high school credits at universities and community colleges.

disabilities[.]"  Avila v. Spokane Sch. Dist. 81, 852 F.3d 936, 943 (9th Cir. 2017); see also Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 29 (1st Cir. 2006) (discussing the IDEA's "remedial structure"); E.M. v. N.Y.C. Dep't of Educ., 758 F.3d 442, 454 (2d Cir. 2014) (discussing the IDEA's "remedial purpose").  Defining "public education" only as education that is delivered at so-called "traditional" public schools would significantly curtail the number of students with disabilities -- particularly those students ages 18 through 21 -- who would be entitled to FAPE under the IDEA.  Hence, we approach appellees' attempt to circumscribe the IDEA's reach mindful of "the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes."  Tcherepnin v. Knight, 389 U.S. 332, 336 (1967).[4]

## 1. Rhode Island State Law

Appellees cite numerous provisions of Rhode Island state law in which they say the term "public education" refers to their

---

[4] Reflecting appellees' argument, our dissenting colleague acknowledges the IDEA's focus on "educational opportunities up through secondary school," but treats "secondary school" as if the IDEA's concern is the format in which the education is presented rather than on educational content.  The statute is necessarily concerned with equal opportunities to gain the knowledge associated with completion of secondary school.  When such opportunities are offered to students without disabilities through state-funded and managed adult education programs, we should be wary of adopting an interpretation of the IDEA that denies equal access for students with disabilities -- in direct conflict with the statute's objective.  Indeed, IDEA itself emphasizes the need

notion of "traditional" public schools.  They assert that an inquiry into Rhode Island law is appropriate because § 1412(a)(1)(B)(i) speaks of whether the provision of FAPE beyond age 18 "would be inconsistent with <u>State law or practice</u> . . . respecting the provision of public education."  20 U.S.C. § 1412(a)(1)(B)(i) (emphasis added).

We reject appellees' premise that Rhode Island law should play any role in determining the meaning of "public education" as used in § 1412(a)(1)(B)(i) of the IDEA.  That section does not delegate the definition of "public education" to the states.  The reference to "[s]tate law or practice" relates only to whether a state discretionarily <u>provides</u> "public education" to students aged 18 through 21.  What constitutes "public education" does not itself vary from state to state.  Indeed, to allow each state to define "public education" would not only result in fifty different interpretations of the IDEA, but it would also permit states to circumvent the FAPE requirement by characterizing any educational services they provide to students aged 18 through 21 as something other than "public education."  Even more fundamentally, we find appellees' invocation of Rhode Island law at odds with their position that the ordinary meaning of "public

_____

to coordinate its requirements with other local, state, and federal efforts to ensure that "special education can become a service for [children with disabilities] rather than a place where such children are sent."  20 U.S.C. § 1400(c)(5)(C).

education" should apply in this case. Logically, it makes no sense to assert that the ordinary meaning of a term, as Congress would have understood it, depends on how an individual state uses that term in its local statutes. Put simply, Rhode Island law is not a proper guide to the meaning of "public education" under the IDEA.

## 2. Other Federal Code Provisions

Appellees also rely on 29 U.S.C. § 3272 of the Workforce Innovation and Opportunity Act ("WIOA"), which defines the term "adult education," and § 1401(34) of the IDEA, which defines the term "transition services" and lists "adult education" as one such service. Appellees contend that these provisions somehow reveal Congress's intent to make "public education" and "adult education" mutually exclusive categories -- i.e., if something is adult education, it cannot also be public education. Starting from that premise, appellees seemingly argue that the distinction between the two categories depends on whether education is delivered at a "traditional public school."

Neither provision supports the appellees' conception of "public education." To start, their reliance on the definition of "adult education" in § 3272 of the WIOA[5] is misplaced. This

---

[5] Section 3272 states: "The term 'adult education' means academic instruction and education services below the postsecondary level that increases an individual's ability to- (A) read, write, and speak in English and perform mathematics or other activities necessary for the attainment of a secondary school diploma or its recognized equivalent[.]" 29 U.S.C. § 3272.

- 14 -

definition became law nearly forty years after the relevant portions of the IDEA, in the context of a workplace-focused, not an education-focused, statute. By invoking the WIOA, appellees appear to be relying on a version of the "whole code" canon of statutory interpretation, "under which courts construe terms across different statutes consistently." Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside -- an Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 936 (2013). However, the notion that Congress, acting on legislation separated by forty years and addressing different subjects, would be attentive to the consistent usage of a phrase, reflects a fanciful version of the legislative drafting process. Indeed, there is little evidence that treating the United States Code as a single body of consistent law "reflects how Congress drafts or even how it tries to draft" legislation. Id. In any event, given the differences in both time and subject matter between the WIOA and the IDEA, we find appellees' invocation of the WIOA wholly irrelevant to our inquiry.

As for § 1401(34) of the IDEA,[6] the term "adult education" is mentioned in a list of programs that may constitute

---

[6] Section 1401(34) states:

> The term "transition services" means a coordinated set of activities for a child with a disability that— (A) is designed to be within a results-oriented process, that is focused on improving the academic and

- 15 -

"transition services." According to appellees, "Congress's use of the term 'adult education' [in the definition of transition services] demonstrates its intent to distinguish adult education from public education." See Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 346 (1st Cir. 2004) ("Congress's use of differential language in various sections of the same statute is presumed to be intentional.").

Other than another mechanical invocation of a canon of statutory interpretation, appellees fail to offer any support for this claim. The IDEA merely states in § 1401(34) that "adult education" is a type of transition service when it is "focused on improving the academic and functional achievement of [a] child with a disability to facilitate the child's movement from school to post-school activities."[7] 20 U.S.C. § 1401(34). The fact that

> functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation[.]

20 U.S.C. § 1401(34).

[7] As discussed in greater detail in Section III, infra, Rhode Island's system of "adult education" does not constitute "transition services" within the meaning of the IDEA because it is not part of "a coordinated set of activities for a child with a disability." 20 U.S.C. § 1401(34).

some forms of adult education constitute "transition services" under the IDEA does not remotely suggest that adult education in other forms is not "public education" within the meaning of the IDEA. Appellees fail to confront this flaw in their argument. In fact, when asserting that adult education is not "public education," appellees do not even offer a definition for the term "adult education" within the meaning of the IDEA. Ultimately, then, appellees argue that we should take the term "public education," which Congress did not define, and the term "adult education," which Congress did not define, and summarily conclude that Congress nevertheless designed them as mutually exclusive categories of education. We reject this unsupportable view of legislative drafting.[8]

### 3. IDEA Regulations

Lastly, appellees cite an IDEA regulation defining the term "high school diploma" to support their claim that "public

---

[8] The dissent attempts to support appellees' reading by invoking a grammatical rule whose applicability is belied by the statutory text. Our colleague asserts that the location in the sentence of the words "adult education" means that Congress considered adult education a "post-school activit[y]" and therefore not "public education." Aside from the obvious point made above that "adult education" covers a wide range of educational programs -- some of which may be post-school activities and some of which may be public education -- the inclusion of "vocational education," long an aspect of public education, shows that the listed items are part of the "coordinated set of activities" that constitute transition services and not exclusively "post-school activities."

education" within the meaning of the IDEA can occur only at what they deem "traditional" public schools. A provision of the Code of Federal Regulations, 34 C.F.R. § 300.102, clarifies that "[t]he obligation to make FAPE available to all children with disabilities does not apply . . . [to] [c]hildren with disabilities who have graduated from high school with a regular high school diploma," but, "the term regular high school diploma means the standard high school diploma . . . [not] a recognized equivalent of a diploma, such as a general equivalency diploma." 34 C.F.R. § 300.102(a)(3)(i),(iv). Appellees argue that if receipt of a non-traditional high school diploma is insufficient to end FAPE services, it should follow that publicly funded educational services that help students obtain equivalency diplomas should likewise not count as "public education."

Appellees misconstrue the IDEA regulation. Although an equivalency diploma or other alternative credential may differ in some respects from a regular high school diploma, it does not follow that educational services which help students attain an equivalency diploma are not "public education." Education is the process by which students attain academic competency, not the document memorializing that process. Indeed, the evident purpose of the regulation is to prohibit states from terminating FAPE services early by bestowing a potentially inferior "general equivalency diploma, certificate of completion, certificate of

- 18 -

attendance, or similar <u>lesser</u> credential." 34 C.F.R. § 300.102(a)(3)(iv) (emphasis added). In other words, the regulation is aimed at preventing termination of FAPE services before a student actually demonstrates the level of academic achievement commensurate with receiving a regular high school diploma. This regulation furthers the IDEA's remedial purpose of protecting the educational rights of students with disabilities, an objective at odds with appellees' reliance on it to curtail access to special education services.

**C. Summary**

Since the IDEA does not define the term "public education," we have turned, out of necessity, to its ordinary usage as Congress would have understood it. Based on our understanding of the phrase's ordinary meaning, which is consistent with both dictionary definitions and the IDEA's definition of FAPE, the first two attributes of "public education" are: (1) significant funding from a public source and (2) public administration or oversight. Mindful of the context of the IDEA, however, we supplement this ordinary understanding of "public education" with a third attribute: (3) the education of students to the academic competence ordinarily associated with completion of secondary school. Although appellees contend that "public education" is further limited to education provided at "traditional public schools" -- a vague limitation that would impede the IDEA's remedial purpose

- 19 -

-- their arguments in support of such an additional attribute are meritless.[9]

Given this understanding of the three attributes of "public education," we turn to whether Rhode Island provides such education to individuals up to age 22 and, hence, must provide FAPE to individuals with disabilities through that same age.

### III. Rhode Island's System of Education

### A. Background

The elements of Rhode Island's educational system, including its provision of services for students with disabilities, are almost entirely undisputed. We thus begin by describing the relevant aspects of that system as revealed by the factual record developed in the district court.

Rhode Island requires persons who have "not completed eighteen (18) years of life [to] regularly attend some public day school during all the days and hours that the public schools are

---

[9] The dissent suggests that we have adopted an insupportably broad definition of public education that goes beyond the dictionary definitions we have quoted, noting, for example, our acceptance of "significant" public funding as one of the core attributes. However, even our colleague does not suggest that an educational program may be characterized as state-funded, and, hence, public education, only if it receives 100 percent of its funds from the state. The term "significant" adequately reflects the state's primary role in public education funding, consistently with the dictionary definitions. Indeed, in light of our obligation to construe the IDEA "broadly to effectuate its purposes," we think it is our colleague who errs by construing the provision too narrowly. Tcherepnin, 389 U.S. at 336.

in session." R.I. Gen. Laws § 16-19-1(a). While school attendance is not compulsory after age 18, there is no state law expressly setting a maximum age for school attendance. The sixty-six Local Education Agencies in Rhode Island have discretion in determining whether to admit older students. In general, however, most individuals stop attending public schools at or about the age of 18. Appellant does not contend on appeal that the possibility of select, older individuals attending Rhode Island's public schools is, on its own, sufficient to constitute a state "practice" of providing public education to adult individuals.

Rhode Island law also states that "all citizens, regardless of age, have a right to education." R.I. Gen. Laws § 16-63-2(a)(1). To accommodate this right, Rhode Island funds a network of community-based organizations ("CBOs") to deliver adult education to students who have aged-out of -- in practice if not by law -- the state's public schools. Such services cover persons between the ages of 21 and 22, in addition to persons of other ages.

Rhode Island funds approximately thirty-four CBOs to administer adult education services. These CBOs consist of different types of entities, including homeless shelters, stand-alone adult education centers, and community organizations run by local municipalities. The services the CBOs provide include basic education, secondary education, and education for English language

learners.  Some of the programs prepare students to take the GED test, a national standardized high school equivalency exam.

The CBO model for adult education, which envisions a variety of settings and educational content, inevitably differs in form, to varying degrees, from the model offered in Rhode Island's conventional brick-and-mortar public elementary and secondary schools.  For example, at the secondary level, students are required to earn "20 credits, spanning six core academic areas," and the school year must extend "at least 180 days, with a minimum of 6 hours per school day."  The absence of these specific requirements, however, does not release CBOs from the oversight of the Rhode Island Department of Education.  The Department's role includes, at a minimum: providing funding, conducting oversight through accountability measures, setting performance targets, and withdrawing funding when performance is inadequate.

Rhode Island also has regulations governing the provision of special education services.  One directive states that "free appropriate public education must be available to all eligible children residing in the [Local Education Agency], between the ages of 3 and 21, inclusive (until the child's twenty first birthday or until the child receives a regular high school diploma)."  R.I. Bd. of Educ., Regulations Governing the Education of Children with Disabilities, B § 300.101(a) (Oct. 9, 2013). Although partially mirroring the language of the IDEA, Rhode Island

law differs by explicitly ending the required provision of FAPE based on a person's twenty-first birthday.[10] Hence, if Rhode Island provides "public education" until a person turns 22, the ending of FAPE for students with disabilities before that age would violate the IDEA.

Thus, the question before us is whether the adult education offered in Rhode Island possesses sufficient attributes of "public education" to so qualify under the IDEA. That is, consistent with our discussion above, does Rhode Island's system of adult education possess the three attributes of "public education" within the meaning of the IDEA: a significant measure of public funding, public administration or oversight of the services, and an objective to educate a population up to the academic level sufficient to obtain a high school degree.

## B. Evaluating Rhode Island's Adult Education Services

Whether Rhode Island's system of adult education services qualify as "public education" within the meaning of the IDEA has significant ramifications for the educational opportunities offered to students with disabilities for the year

---

[10] A June 2016 amendment to the Rhode Island General Laws restates this age limitation, but it specifies that special education services should extend to the end of the academic year in which the student with a disability turns 21. See R.I. Gen. Laws § 16-24-1(f). Even with this amendment, there is a period of time between a student's twenty-first and twenty-second birthdays when the provision of FAPE is not ensured, as is potentially required by the IDEA.

between ages 21 and 22.  At present, if a 21-year-old student in Rhode Island does not complete high school for a non-disability related reason -- say, because she was previously incarcerated -- the state will provide her the services needed to attain a secondary-school level of academic proficiency and a route to obtain a high-school level degree.  However, if the same 21-year-old does not complete high school due to a qualifying disability, the state currently does not offer her ability-appropriate services to attain the same level of educational achievement.  Under Rhode Island's current system, students without disabilities "can pursue the diplomas that eluded them in high school, but students with special needs are simply out of luck."  E.R.K., 728 F.3d at 992.  To determine whether this educational disparity violates the IDEA's FAPE requirement, 20 U.S.C. § 1412(a)(1)(A), we consider each attribute of "public education" in turn.

### 1. Funding

Rhode Island provides approximately eighty percent of the total costs of the CBO adult-education programs, and the remaining fees for students are waived in some cases.  In fact, the use of such "public funds" to support the delivery of "adult education" services is mandated by state law.  See R.I. Gen. Laws § 16-63-2(b)(3).  Moreover, the decisions whether to fund and how much to fund adult education providers are decisions within the

discretion of the state's general assembly.  See R.I. Gen. Laws § 16-63-14.

## 2. Administration or Oversight

RIDE -- the same state agency that oversees Rhode Island's public school system generally -- also oversees the CBO adult education providers.  By law, adult education services must be "integrated and coordinated" and "provided and maintained on a statewide basis."  R.I. Gen. Laws § 16-63-2(b)(2).  RIDE monitors adult education providers through the use of accountability measures, including setting performance targets.  See David V. Abbott Dep., Doc. 52-4, K.S. v. R.I. Bd. of Educ., No. 1:14-cv-00077-WES-LDA, Doc. 52-4, at 14 (stating that the Department imposes performance standards on adult education programs and "track[s] their compliance with performance expectations").[11]  In addition, RIDE can sanction CBOs by withdrawing public funding if their adult education performance is deemed inadequate.  Moreover, Rhode Island law authorizes adult education to be administered through a variety of state agencies and organizations, including, "(1) [t]he schools and other facilities maintained by local

---

[11] Appellant contends that RIDE's oversight of adult education amounts to the imposition of performance "standards," while appellees claim that RIDE's oversight is the setting of "performance targets."  This dispute is immaterial to the legal question in this case.  Even the setting of "targets," accompanied by the ability and willingness to withdraw public funds for the failure to reach such targets, is an unmistakable indication of public education.

education authorities . . . [,] (3) [t]he state operated institutions of higher education . . . [, and] (7) [t]he state's interrelated library system."  R.I. Gen. Laws § 16-63-9(a). Although adult education in Rhode Island is also administered at other, non-public entities, it is notable that state law envisions the delivery system for adult education to include public agencies and institutions.  In sum, there is a substantial level of public involvement in Rhode Island's adult education services.

### 3. Educational Objective

Lastly, a primary objective of the Rhode Island adult education program is to assist students in achieving a secondary-education level of academic competence.  Specifically, adult education in Rhode Island, similar to appellees' notion of traditional public schools, must, among other things, establish "[p]rograms and services" that will "provide opportunities for academic achievement up to grade twelve (12)."  R.I. Gen. Laws § 16-63-5(1).  Hence, Rhode Island's adult education system provides for the education of students to the level of academic proficiency needed to sit for and pass the GED exam or to complete the National External Diploma Program ("NEDP"). Id. (defining a basic education as including "preparation for the demonstration of competencies to qualify for the adult high school diploma or for

examinations to earn the general educational development or high school equivalency diploma").

Despite the comparable objectives, appellees seek to draw significance from the differences between what they deem a traditional secondary school setting and the contexts in which individuals pursue studies toward successful completion of the GED or the NEDP.  For example, appellees claim that adult education programs cannot be "public education" because they do not have the comparable classroom hours and course credit requirements as the other supposedly "traditional" public schools they consider the norm.  Appellees also note that the degrees awarded to students who successfully pass the GED have the word "equivalency" written on the diploma.

We, however, see no defensible rationale for distinguishing among educational programs that have the attributes of "public education" based solely on locale and method of delivery.  Indeed, even Rhode Island's regulations recognize the educational parity of supposedly "traditional" public schools and the adult equivalency programs by mandating that an "Equivalency Diploma" is "of the same status as a regular high school diploma." R.I. Dep't of Educ. and Secondary Educ., Regulations of the Board

of Education Governing the Rhode Island High School Equivalency Program, 1.2 (2013).

In adopting in full the appellees' perspective, the dissent states, in effect, that it is irrelevant that Rhode Island offers students without disabilities the opportunity to achieve high school diplomas or equivalency diplomas through adult education programs. In our colleague's view, those programs are not "the functional equivalent of secondary school for purposes of the IDEA," and "they do not resemble preschool, elementary school, or secondary school." But in so arguing, the appellees and our colleague turn the IDEA on its head. They rely on language intended to ensure that students with disabilities are provided opportunities to learn in traditional school settings -- from which they routinely had been excluded -- as a rationale for excluding them from non-traditional forms of public education. In other words, depicting IDEA as focused solely on so-called traditional school settings misses the point. The pertinent question is not where public education is provided to students without disabilities who are beyond age 18, but whether it is provided to them in some form.

Contrary to the dissent's contention, our interpretation of the IDEA does not "impose[] on Rhode Island choices that the state did not make" -- other than those that are the very purpose of the IDEA. Rhode Island has made the choice to fund and oversee adult

education programs that are designed, in part, to help individuals without disabilities, up to age 22, achieve secondary-level competencies. That choice, under the IDEA, requires the state to provide FAPE for students with disabilities of the same age. The dissent warns that requiring parity between students with and without disabilities through age 21 will have financial consequences that may cause a reduction in services now provided to other students, citing the statement of the Rhode Island Board of Education at oral argument that a ruling for K.L. would impose significant indirect costs on the state. The facts presented to us, however, suggest otherwise. Rhode Island currently provides special education services to the end of the academic year in which the student with a disability turns 21. See supra note 10. Accordingly, some students with disabilities already receive special education services well into their twenty-second year. It is thus difficult to see how a requirement to extend those services to the student's twenty-second birthday would "significant[ly]" increase costs such that Rhode Island would be deterred from assisting young adults to achieve secondary-level educational competence.

Moreover, the very purpose of the IDEA provision at issue here is to ensure equivalent educational opportunities for students with and without disabilities. It is simply not a response to the requirement of equality to say that students with

disabilities may properly be afforded less education because equal treatment will be too costly.[12]

In sum, as the foregoing assessment of the core attributes demonstrates, the adult education services in Rhode Island qualify as "public education" within the meaning of the IDEA.[13] Rhode Island provides the adult education CBOs with significant public funding, the state's education department -- RIDE -- provides a substantial level of oversight for the adult education programs, and Rhode Island's adult education services share the objective of public schools generally to educate students

---

[12] Nor can we reject the "public education" label for adult education programs that teach secondary-level competencies, such as Rhode Island's, on the ground that most students pay a portion of the cost of such programs. Otherwise, states could escape the obligation of parity for students with disabilities simply by assessing a small fee for students without disabilities. Programs that are both largely funded by the state -- 80 percent in Rhode Island -- and largely free to students fall within the scope of § 1412(a)(1)(B)(i). Put another way, students without disabilities who receive an eighty percent public subsidy for secondary-level instruction are plainly receiving "public" education.

[13] Appellees make several additional arguments that we do not address. They contend that Rhode Island does not currently provide public education, either by law or practice, to residents over the age of 18 at public schools. As noted above, however, appellant does not argue on appeal that Rhode Island does so. Moreover, since Rhode Island's "adult education" services constitute "public education" within the meaning of the IDEA, this argument is beside the point. Appellees also make multiple arguments that respond to the analysis of, or factually distinguish this case from, the Ninth Circuit's decision in E.R.K., 728 F.3d 982. We do not adopt the Ninth Circuit's approach to interpreting the IDEA, however, and we therefore need not address those arguments.

to a secondary education level of academic achievement. Although Rhode Island's so-called "traditional" public schools and its adult education programs may, to various degrees, differ in their formats and locations, they are both properly characterized as "public education" for purposes of the IDEA.[14]

## IV. Conclusion

For the reasons explained above, the IDEA's requirement that states provide FAPE to students until their twenty-second birthday is not inconsistent with Rhode Island's law or practice "respecting the provision of public education," and, therefore, the limitation set forth in § 1412(a)(1)(B)(i) does not apply. Hence, to the extent that Rhode Island General Laws § 16-24-1(f)[15]

---

[14] Appellees asserted at oral argument that if we decide that the Rhode Island adult education CBOs are providing "public education" within the meaning of the IDEA, then the remedy in this case must be that the CBOs have to provide the required FAPE-compliant services to students with disabilities. They posited that many of the CBOs are ill-equipped to do so. Appellees' concern is unfounded. Nothing in the IDEA, nor in this opinion, mandates that Rhode Island CBOs provide the required IDEA-compliant special education services to students with disabilities. Our conclusion that Rhode Island's provision of adult education constitutes the provision of "public education" up to the age of 22 means only that the state must likewise provide FAPE to students with disabilities up to the age of 22. We leave it to the parties, working with the court on remand, to decide the appropriate setting for the provision of those services.

[15] Section 16-24-1(f) states: "A child with a disability as referenced in subsection (a) of this section shall have available to them any benefits provided by this section up to their twenty-first birthday, in accordance with the student's individualized education program (IEP)." R.I. Gen. Laws § 16-24-1(f).

and Regulations Governing the Education of Children with Disabilities § 300.101(a)[16] are noncompliant with the mandate set forth in § 1412(a)(1)(A), they are invalid. Accordingly, we vacate the district court's judgment in favor of appellees, and direct the court to enter judgment for appellant. We leave it to the district court, working with the parties, to develop appropriate remedies.

The district court's judgment is vacated, and the case is remanded for entry of judgment in favor of appellant and remedial proceedings consistent with this opinion.

So ordered. Costs to appellant.


**-Dissenting Opinion Follows-**

---

[16] "A free appropriate public education must be available to all eligible children residing in the LEA, between the ages of 3 and 21, inclusive (until the child's twenty first birthday or until the child receives a regular high school diploma)[.]" R.I. Bd. of Educ., Regulations Governing the Education of Children with Disabilities, B § 300.101(a) (Oct. 9, 2013).

**LYNCH**, **Circuit Judge, dissenting**.   With great respect for my colleagues, I disagree with the majority's interpretation of the IDEA's language concerning the provision of "public education," and so disagree as to the majority's conclusion that Rhode Island school systems are obliged to provide special education to students until age twenty-two.   The majority's definition of "public education" as used in 20 U.S.C. § 1412(a)(1)(B)(i) is refuted by the text, is inconsistent with the term's ordinary meaning and the statutory context, and is, I believe, contrary to congressional intent.

The majority's conclusion is also a serious breach of federal policy concerning local control of public school systems. The majority opinion will impose, by judicial fiat, burdens on local taxpayers and local educational agencies (LEAs), contrary to the intent of Congress.   The majority responds to my expression of these concerns by speculating that there will be no such burden. Not so.   When, at oral argument, we posed the precise question to the Rhode Island Board of Education, which actually knows what the consequences of this decision will be, the answer was that a ruling for K.L. would impose significant costs to be borne by LEAs, and indirectly, by the state.

The IDEA was meant to ensure equal opportunities for disabled and non-disabled students in the provision of "public education."   See id.   "Public education" encompasses preschool,

- 33 -

elementary school, and secondary school that is free, paid for by the state, and controlled by the state. This does not include "adult education," which the IDEA classifies as a "post-school activit[y]," and which the statute distinguishes from regular "school." Id. § 1401(34)(A). Congress clearly intended that the provision at issue provide flexibility to states, so long as they do not discriminate (and Rhode Island does not) against disabled students with regard to equivalent educational opportunities. See id. § 1412(a)(1)(B)(i). The adult education programs offered in Rhode Island do not meet Congress's definition of "public education" because they are not free or paid for by the state, are not controlled by the state, and most certainly do not resemble preschool, elementary school, or secondary school, whether the approach in those settings is traditional or innovative. By expanding the meaning of "public education" through judicial interpretation, the majority's decision overrides prerogatives intended by Congress to be left to the states.

I.

The majority accepts K.L.'s argument that Rhode Island has run afoul of the IDEA by declining to provide special education to disabled students between the ages of twenty-one and twenty-two, while making adult education available for students aged twenty-one and older. There is no evidence that non-disabled students may remain in public schools in Rhode Island until age

- 34 -

twenty-two.  K.L.'s argument thus turns on the federal law question of whether "public education," as used in the IDEA, encompasses "adult education," and thus forces Rhode Island to extend special education services to students until the age of twenty-two.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989).  The IDEA's purpose is to make the "public school system" able to effectively teach and support students with disabilities.  See 20 U.S.C. § 1400(c)(2)(A)-(D).  Congressional findings memorialized in the text of the IDEA focus on previous shortcomings of the "public school system," as children with disabilities "were excluded entirely from the public school system and from being educated with their peers," and faced "a lack of adequate resources within the public school system" that "forced families to find services outside the public school system."  Id. § 1400(c)(2)(B), (D).

Additionally, the IDEA emphasizes the need for disabled students' access to "school" and the "regular classroom."  See, e.g., id. § 1400(c)(5)(A)-(F).  The IDEA "was passed in response to Congress'[s] perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'"  Bd. of Educ. of Hendrick

- 35 -

Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 179 (1982) (alterations in original) (quoting H.R. Rep. No. 94-332, p. 2 (1975)).

The IDEA's legislative history underscores that the IDEA focuses on the public school system and only those educational opportunities up through secondary school. A Senate Report regarding the IDEA's 1975 predecessor states:

> [t]he Committee points out . . . that a handicapped child has a right to receive all services normally provided a nonhandicapped child enrolled in a public elementary or secondary school. Thus, he or she has a right to physical education services, health screening, transportation services and all other services which are provided to all children within the school system, and a right to as many options in curricula as are available to all children.

S. Rep. No. 94-168, 1975 U.S.C.C.A.N. 1425, 1442-43 (1975).

The IDEA's findings, linguistic choices, and history thus draw a parallel between the education provided to non-disabled students and a free appropriate public education (FAPE) for disabled students. This is reflected in the specific provision at issue here, which states that a FAPE need not be provided to eighteen to twenty-one year olds unless doing so would be inconsistent with the provision of "public education" to non-disabled students in that age range. 20 U.S.C. § 1412(a)(1)(B)(i). Where non-disabled students receive "public education" through the age designated by the statute, then, disabled students receive a

FAPE through that same age.    See id. § 1412(a); id. § 1412(a)(1)(B)(i).

In turn, a FAPE must, in relevant part, be "provided at public expense, under public supervision and direction, and without charge," and "include an appropriate preschool, elementary school, or secondary school education."    Id. § 1401(9)(c). "[S]econdary school," however, "does not include any education beyond grade 12."  Id. § 1401(27).  Since the FAPE requirement is meant to ensure that disabled students are receiving the same opportunities that their non-disabled counterparts are receiving between preschool and twelfth grade, it follows that "public education" encompasses schooling from preschool to twelfth grade that is free, paid for by the state, and controlled by the state.

The majority dismisses Rhode Island's argument that the IDEA is focused on "traditional public schools," in part by misapprehending Rhode Island's point and creating a straw man. The majority says that "public school programs have long included non-traditional educational formats, including vocational or employment-related activities and opportunities to earn high school credits at universities and community colleges."  But the majority mischaracterizes Rhode Island's argument.  Rhode Island's argument is not that this is a matter which turns on the setting where "public education" is provided or on whether vocational or other high school activities are education.  Additionally, Rhode

- 37 -

Island's position is not, as the majority misapprehends, that the test for what is "public education" turns on traditional versus innovative education methods. The IDEA's use of terms like "school," "public school system," and "classroom" emphasizes that the statute only concerns instruction associated with public preschool, elementary, and secondary school. See 20 U.S.C. § 1400(c)(2)(A)-(D); id. § 1400(c)(5)(A)-(D). The result here cannot be cut loose from the moorings provided by that statutory language.

Congress made it clear under the language of the IDEA that "adult education" is not "public education," but something else entirely.[17] The IDEA defines "transition services" as follows:

> The term "transition services" means a coordinated set of activities for a child with a disability that--
>
> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

---

[17] Adult education is governed by 29 U.S.C. § 3111 et seq., whereas Title 20 covers preschool, elementary school, secondary school, and special education.

>    (B) is based on the individual child's needs,
>    taking into account the child's strengths,
>    preferences, and interests; and
>
>    (C) includes instruction, related services,
>    community experiences, the development of
>    employment and other post-school adult living
>    objectives, and, when appropriate,
>    acquisition of daily living skills and
>    functional vocational evaluation.

Id. § 1401(34) (emphasis added). Thus, the IDEA classifies "adult education" as a "post-school activit[y]."[18] Id. "Post-school activities," as used here, are distinguished from "school." Id. Preschool, elementary school, and secondary school, by contrast, are quintessentially "school." "Transition services," in turn, are the various activities that help a child advance from "school" to "post-school activities." Id. Under this formulation mandated by Congress, then, adult education cannot be both "school" and a "post-school activity." To hold otherwise would collapse Congress's deliberate choice of language into nothingness. It was clearly not Congress's intent that "post-school activities" would trigger the FAPE requirement for disabled students in "preschool, elementary school, or secondary school." See id. § 1401(9)(C).

------------

[18] The majority incorrectly states that under this section, "adult education" is classified as a "transition service[]." Under the rule of the last antecedent, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." Lockhart v. United States, 136 S. Ct. 958, 962 (2016) (quoting Barnhart v. Thomas, 540 U.S. 20, 26 (2003)). Here, "adult education" is part of the clause that modifies the term "post-school activities," which immediately precedes it. See 20 U.S.C. § 1401(34)(A).

Given this statutory scheme, the majority's definition of "public education" is unsupportable. It does not assist the analysis to say that the IDEA is generally a remedial statute. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 63 (1st Cir. 2002). The Supreme Court has made it clear that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." Rowley, 458 U.S. at 207. The majority's approach does not accord with Rowley. The majority also runs afoul of the "'general framework of deference to state decision-makers' that is dictated by the IDEA and by the Supreme Court's direction" in Rowley, 458 U.S. at 207-08. Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 758 (3d Cir. 1995) (quoting Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1033 (3d Cir. 1993)). This court has also stressed, in Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186 (1st Cir. 1994), that "[t]he IDEA invests expansive discretion in the states to structure implementing procedures and enforcement mechanisms, thereby constructively incorporating duly promulgated state regulations." Id. at 1196; see 20 U.S.C. § 1400(c)(6) (stating that under the IDEA, states are "primarily responsible for providing an education for all children with disabilities").

If Congress had wanted states that provide adult education to also provide a FAPE to disabled students up until their twenty-second birthdays, it would have said so and done so

directly. Instead, Congress has left this decision to states, and has consistently done so through multiple changes and reauthorizations of the IDEA. Congress included the provision at issue here in the IDEA's 1975 predecessor. See Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, § 612, 89 Stat. 773 (1975). Congress also kept this provision when it reorganized and recodified parts of the IDEA in 1997. See Individuals with Disabilities Education Act Amendments for 1997, Pub. L. No. 105-17, § 612(a)(1)(B)(i), 111 Stat 37 (1997). The provision is clearly meant to preserve the role of states and local communities in the provision of children's education.

The majority's broad interpretation as to Rhode Island's adult education system could arguably raise questions about the validity of other states' implementation of the IDEA provision at issue here. The record suggests that at least one other state, Maine, terminates special education for students with disabilities before their twenty-second birthdays.[19] There will be undeniable financial consequences to requiring local school systems to extend FAPE, including possibly the reduction in services now provided to other students. The majority's interpretation is especially inappropriate given the many variations in states' adult education

---

[19] By statute, Maine guarantees a FAPE only to disabled children "at least 3 years of age and under 20 years of age," see Me. Rev. Stat. Ann. tit. 20-A, § 7001(1-B)(B), and provides for adult education, see id. §§ 8601, 8601-A, 8603.

- 41 -

programs.  See, e.g., E.R.K. ex rel. R.K. v. Hawaii Dep't of Educ., 728 F.3d 982, 985 (9th Cir. 2013) (noting that adult education in Hawaii is administered by the state's department of education and is "tuition-free").

Moreover, the majority's method of analysis and its conclusion are based on error.  The majority reasons that "public education" has two core attributes, "significant funding from a public source" and "public administration and oversight," and pulls these from thin air.  The statute does not say this.  The majority also asserts that the statutory context imposes a third constraint, which is also unsupported.  It says "public education" is limited to "the education of students to the academic competence ordinarily associated with completion of secondary school."

Not only is the majority's definition inconsistent with the statutory terminology and context outlined above, but it does not even align with the dictionary definitions that the majority cites.  These definitions, rather, support my view.  The majority states that the Oxford English Dictionary defines "public education" as "education provided by the State."  "Public Education," Oxford English Dictionary Online (July 2018), http://www.oed.com/view/Entry/154052#eid27762397 (last visited Oct. 25, 2018).  The majority also notes that "public" is "provided or supported at the public expense, and under public control: as in public elementary school."  Oxford English Dictionary 780 (2d

- 42 -

ed. 1989). Random House Dictionary and Random House Webster's Unabridged Dictionary, the majority notes, both define "public" as "maintained at the public expense and under public control," and "public school" as one "maintained at public expense for the education of the children of a community or district and that constitutes a part of a system of free public education commonly including primary and secondary schools." The Random House Dictionary of the English Language 1562-63 (2d ed. 1987); Random House Webster's Unabridged Dictionary 1562-63 (2d ed. 1997).

These definitions do not support the majority's definition, which encompasses programs so long as they receive whatever a court decides is "significant" public funding,[20] are subject to some form of "public administration or oversight," and entail "the education of students to the academic competence ordinarily associated with completion of secondary school." The majority provides no support for these glosses.

II.

The specific features of Rhode Island's adult education system also clearly distinguish it from "public education." First, adult education in Rhode Island is not free and is not provided

---

[20] This expansion to any program which secures "significant" public funding as determined by a court is not only an improper judicial construct, but the majority then uses an alternate term of "primary." Further, the majority's conclusion that this "significant" test has been met on the facts here shows its infirmity.

wholly at public expense. An enrollee in an adult education GED class pays, on average, twenty percent of the cost of obtaining a GED. The Rhode Island Department of Elementary and Secondary Education covers the testing costs and fees only for certain low income students who have received a passing score or higher on the high school equivalency practice test, can prove financial hardship, and are ineligible for other subsidies. The fact that some low income applicants can, if approved, take the GED exam for free if they make a showing of financial hardship and meet other requirements for this state assistance does not mean that the GED programs are free and paid for by the state. Rather, the contrary is true. Additionally, K.L. has made no showing that any or all of the costs associated with the National External Diploma Program (NEDP) are borne by the state.

Second, the adult education programs are not controlled by the state. The programs are offered through a network of community-based organizations, or local non-governmental organizations which are not directly affiliated with the state or a local school district. The adult education programs are provided by, for example, stand-alone adult education providers, homeless shelters, and school libraries. The state does not administer the adult education programs, set their curricula, or determine their schedules. The state simply sets "performance targets" for these

adult education programs.  That there are funding penalties for failure to meet such targets does not show control by the state.

K.L. argues that it is unimportant that community-based organizations, and not state agencies, administer adult education in Rhode Island, because the IDEA's definition of "secondary school" encompasses schools that are not operated directly by the state or a subdivision of the state.  K.L. points out that the IDEA defines "secondary school" as "a nonprofit institutional day or residential school, including a public secondary charter school, that provides secondary education, as determined under State law."  20 U.S.C. § 1401(27) (emphasis added); see also id. § 1401(6) (defining "elementary school" as "a nonprofit institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under State law") (emphasis added).  The statute uses the phrase "as determined by state law," and Rhode Island law certainly does not define adult education as either secondary or elementary school.  And K.L. has provided no information that the level of state involvement in and supervision of such charter and residential schools equates to the minimum level of Rhode Island regulation of adult education, even if that were an appropriate test.

Third, the adult education programs do not resemble preschool, elementary school, or secondary school.  The GED program

may be likened to test preparation courses for the national, standardized GED exam. The NEDP program pairs a student with an "assessor" who "can award credit for demonstrated skills and knowledge a person has from their life experiences." The student is thereafter awarded an "actual high school diploma" from one of three LEAs. The NEDP program does not require any classroom time. The fact that these programs help adult learners obtain high school diplomas or high school equivalency diplomas does not make them the functional equivalent of secondary school for purposes of the IDEA.

Students completing secondary school in Rhode Island, by contrast, must demonstrate "proficiency in 6 core areas (English Language Arts, math, science, social studies, the Arts, and technology)"; "successful completion of 20 courses (at a minimum)"; and "completion of 2 performance assessments (exhibitions, portfolios and/or comprehensive course assessments)." The Council on Elementary and Secondary Education has enacted extensive regulations regarding graduation requirements, which do not apply to adult education programs. The GED and NEDP programs do not require a graduation portfolio, do not require the taking of state assessments, and are "of a different rigor than those offered by the LEAs."

K.L. argues that the difference in content between the adult education programs and the "traditional high school

curriculum" should not matter because the IDEA does not require any particular substantive curriculum for "secondary school." The IDEA provides that the substantive curricula of elementary and secondary schools are set by state law, however. See 20 U.S.C. § 1401(6), (27). Here, Rhode Island's curriculum requirements for adult education differ significantly from those of secondary school. By Rhode Island's substantive standards, then, adult education programs also fail to qualify as secondary school.

Ultimately, by interpreting the IDEA's use of "public education" so broadly as to encompass adult education programs in Rhode Island, the majority has imposed on Rhode Island choices that the state did not make. For over forty years, states have been operating on the assumption that § 1412(a)(1)(B)(i) gives them flexibility to offer a FAPE to children over the age of eighteen. The majority upsets that expectation and does so without having any basis in the text of the IDEA or the record.

I respectfully dissent.