Pennsylvania School Boards      :
Association, Inc., School District of   :
Pittsburgh, Central Bucks School    :
District, and Upper Darby School    :
District,                         :
              Petitioners     :
                            :
        v.                 :
                            :
Dr. Khalid N. Mumin, Secretary of   :
Education of the Pennsylvania     :
Department of Education, and the    :
Pennsylvania Department of Education, :   No. 409 M.D. 2023
            Respondents    :   Argued: February 7, 2024

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MATTHEW S. WOLF, Judge

OPINION BY
JUDGE COVEY                               FILED: May 16, 2024

        Before this Court are the Pennsylvania School Boards Association,

Inc.'s (PSBA),[1] School District of Pittsburgh's, Central Bucks School District's, and

Upper Darby School District's (School District Petitioners) (collectively,

---

[1] "PSBA is a voluntary membership organization whose membership includes school districts, [i]ntermediate [u]nits [(IUs)], public vocational technical schools, community colleges[,] and the school directors of said entities. [] Currently, 498 school districts, 27 [IUs,] and 61 vocational-technical schools are members of PSBA, as are the approximately 4,482 school directors serving said entities." *See* Petitioners' Appl. for Summ. Relief Ex. P-63 (Stipulations) ¶¶ 8-9.

Petitioners) Application for Summary Relief (Petitioners' Application), and Dr. Khalid N. Mumin, Secretary of Education of the Pennsylvania Department of Education's and the Pennsylvania Department of Education's (Department) Application for Summary Relief (Department's Application) (collectively, Cross-Applications). Upon exhaustive review, this Court grants Petitioners' Application and denies the Department's Application.

**Background**

The Individuals with Disabilities Education Act (IDEA)[2] is the United States (U.S.) government's guarantee that children with disabilities will receive needed special education services. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017). To that end,

> [t]he IDEA requires states to "make available a free and appropriate public education [(FAPE)[3]] to all children

---

[2] 20 U.S.C. §§ 1400-1482.
[3] Section 1401(9) of the IDEA defines FAPE as

> special education and related services that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the [s]tate educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the [s]tate involved; and (D) are provided in conformity with the individualized education program [(IEP)] required under [S]ection 1414(d) of [the IDEA, 20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).

> Once a child is identified as having special needs, "[a] school district provides a FAPE by designing and implementing an individualized instructional program set forth in an [IEP], which 'must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" [*P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727,]

2

with disabilities residing within their borders." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010). It accomplishes this by making contingent certain federal funding to State Educational Agencies ([]SEAs[])[4] and Local Educational Agencies ([]LEAs[])[5] upon the adoption of plans consistent with its provisions. *See* [Sections 1412 and 1413 of the IDEA,] 20 U.S.C. §§ 1412, 1413.

*R.V. v. Rivera*, 220 F.Supp.3d 588, 590-91 (E.D. Pa. 2016) (footnotes omitted).

Specifically, Section 1412(a) of the IDEA declares that a state is eligible for federal funding "if [it] submits a plan that provides assurances to the Secretary [of the U.S. Department of Education (USDE) (Secretary)] that the [s]tate has in effect policies and procedures to ensure that the [s]tate" offers a FAPE to children with disabilities. 20 U.S.C. § 1412(a); *see also* Section 300.100 of the USDE's Regulations, 34 C.F.R. § 300.100 ("A [s]tate is eligible for assistance under Part B of the [IDEA (IDEA-B)] for a fiscal year if the [s]tate submits a plan that

---

729-30 [(3d Cir. 2009)] (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)).

*G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015).

[4] Under the IDEA and part 300 of the U.S. Department of Education's (USDE) Regulations, 34 C.F.R. §§ 300.101-300.199, the Department is the SEA responsible for ensuring that the IDEA's requirements are met in Pennsylvania. *See* 20 U.S.C. § 1412(a)(11); *see also* Petitioners' Appl. Ex. P-23 at 33.

[5] According to Section 14.103 of the Department's Regulations,

[w]here the [f]ederal provision uses the term [LEA,] for purposes of this chapter, the term means an [(IU)], school district, [s]tate[-]operated program or facility or other public organization providing educational services to children with disabilities or providing early intervention services. Applicability of this term to public charter schools is found in Chapter 711 (relating to charter school services and programs for children with disabilities). In the application of [Sections 300.130 through 300.144 of the USDE's Regulations,] 34 C[.]F[.]R[.] 300.130-300.144, regarding children with disabilities enrolled by their parents in private schools, the [IU] shall be considered to be the [LEA].

22 Pa. Code § 14.103; *see also* Section 1401(19)(A) of the IDEA, 20 U.S.C. § 1401(19)(A).

provides assurances to the Secretary that the [s]tate has in effect policies and procedures to ensure that the [s]tate meets the conditions in [Sections 300.101 through 300.176 of the USDE's Regulations, 34 C.F.R.] §§ 300.101[-]300.176."). Each participating state must also assure the Secretary as a condition of funding that, *inter alia*, its SEA will be responsible for compliance with the IDEA's terms and will supervise the LEAs' IDEA-funded programs. *See* Section 1412(a)(12)(A) of the IDEA, 20 U.S.C. § 1412(a)(12)(A).

Since 1976, to be eligible for federal funding under Section 1412(a)(1) of the IDEA, the Department has submitted a State Plan assuring the USDE that Pennsylvania has policies and procedures in effect that meet the conditions in Sections 300.101 through 300.176 of the USDE's Regulations.[6] *See* Petitioners' Appl. Ex. P-63 (Stipulations) ¶¶ 38-39. Indeed, the Department "adopt[ed] [f]ederal regulations . . . to satisfy the statutory requirements under the [IDEA,]" 22 Pa. Code § 14.102(a)(1), specifically Part 300 of the USDE's Regulations "(relating to assistance to states for the education of children with disabilities)[.]" Section

---

[6] The Department also submits to the USDE's Office of Special Education Programs (OSEP) a "State Performance Plan/Annual Performance Report: Part B for State Formula Grant Programs Under the IDEA [(SPP/APR).]" *See* Stipulations ¶ 39; *see also* Stipulations Ex. P-34. The SPP/APR is different from and does not reference the State Plan. This Court takes judicial notice that the Department's website describes the SPP/APR as follows:

> The SPP[/APR], first submitted in 2005, and now expanded to 2018, is a multi-year plan to guide improvement in special education programs. It is built around federally mandated indicators of performance and compliance and includes baseline data and measurable and rigorous targets for each indicator. States must report data annually to OSEP on the state's performance in meeting the established targets. [The] IDEA 2004 also requires states to report annually to the public on the performance of each LEA in the state on the targets in the SPP. Data reported in the SPP/APR are used by OSEP to determine the extent to which a state is complying with [the] IDEA.

www.education.pa.gov/K-12/Special%20Education/IDEA/Pages/StatePerformancePlan.aspx (last visited May 15, 2024).

14.102(a)(2) of the Department's Regulations, 22 Pa. Code § 14.102(a)(2). The Department also agreed to "provide . . . general supervision of services and programs provided under this chapter." Section 14.102(a)(4) of the Department's Regulations, 22 Pa. Code § 14.102(a)(4).

Importantly, the Department declared that, in order "[t]o provide services and programs effectively, [it] will delegate operational responsibility for school aged students to its school districts . . . ." Section 14.102(b) of the Department's Regulations, 22 Pa. Code § 14.102(b). To ensure that the school districts comply with the IDEA and the Department's requirements, Section 14.104 of the Department's Regulations provides, in relevant part:

> (a) Each school district shall develop and implement a special education plan. The special education plan shall be submitted to the Department for approval every [three] years in accordance with [Section 4.13(d) of the Department's Regulations, 22 Pa. Code] § 4.13(d) (relating to strategic plans). . . .
>
> . . . .
>
> (c) Each school district's special education plan must include procedures for the education of all students with disabilities who are residents of the district, including those receiving special education in approved private schools and students with disabilities who are nonresidents placed in private homes or institutions in the school district under [S]ections 1305, 1306 and 1306.2 of the [Public School Code of 1949 (School Code),[7]] (24 P.S. §§ 13-1305, 13-1306[,] 13-1306.2).[8]
>
> . . . .
>
> (f) The Department will approve plans in accordance with the following criteria:

---

[7] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 - 27-2702.
[8] Section 1306.2 of the School Code was added by Section 5 of the Act of June 25, 1997, P.L. 297.

. . . .

> (4) The plan meets the specifications defined in this chapter [(titled Special Education Services and Programs)] and the format, content[,] and time for submission of the agency plans prescribed by the [Department's] Secretary.

22 Pa. Code § 14.104.

In addition, the Department created the "Commonwealth of Pennsylvania Model [LEA] Policies and Procedures" (Model Policy), wherein it acknowledged its responsibility "for ensuring . . . that each educational program for children with disabilities administered within P[ennsylvania] . . . meets the [Department's] education standards . . . (including the requirements of . . . Part 300 [of the USDE's Regulations])." *See* Petitioners' Appl. Ex. P-23 at 33. LEAs that comply with the Model Policy are eligible for a portion of the federal funding the Department receives from the USDE.

The Department distributed its most recent Model Policy to Pennsylvania's LEAs, including Petitioners, on July 1, 2018. Petitioners' Appl. Ex. P-23. Therein, the Department notified them, *inter alia*:

> Under the regulatory provisions of [IDEA-B], to be eligible for funds[,] the [LEA] must, among many things, demonstrate to the satisfaction of the [(the Department)] that it meets the conditions in [Sections] 300.101 through 300.163[] and [] 300.165-300.174 [of the USDE's Regulations, 34 C.F.R. §§ 300.101-.163, 300.165-.174]. The conditions under [Section] 300.220 [of the USDE's Regulations, 34 C.F.R. § 300.220,] require the LEAs to have in effect policies, procedures, and programs that are consistent with the [s]tate policies and procedures established under [Sections] 300.101-300.163[] and [] 300.165-300.174 [of the USDE's Regulations]. The [school b]oard approved LEA [p]olicies and [p]rocedures must be on file with the Department . . . .
>
> . . . .

6

> Acceptance of this [Model Policy], in part, fulfills the requirements at [Section 300.200 of the USDE's Regulations], 34 C[.]F[.]R[.] § 300.200 in meeting the conditions under [*LEA*] *Eligibility*.

Petitioners' Appl. Ex. P-23 at 2. There is no basis presented in the Petition for Review or the Cross-Applications upon which this Court can rely to conclude that Petitioners did not accept or comply with the Model Policy.[9]

The Department also submitted its State Plan to the USDE on July 1, 2018. *See* Petitioners' Appl. Ex. P-56.[10] The USDE approved the Department's most recent State Plan on June 23, 2023.[11] Stipulations ¶ 40; *see also* Petitioners' Appl. Ex. P-32.[12] The Department's State Plan expressly describes and incorporates its Model Policy.[13] Petitioners' Appl. Ex. P-56 at 2.

---

[9] The Department does not challenge the Petition for Review or Petitioners' Application on the basis that Petitioners, including the School District Petitioners, have declined to accept the Model Policy, and Petitioners' counsel represented at oral argument before this Court that Petitioners had an ongoing desire to comply therewith.

[10] Despite being designated as Petitioners' Application Exhibit P-56, the Department's most recent State Plan is attached as Settlement Agreement Exhibit A to the Petition for Review Exhibit D. *See* Petitioners' Appl. Ex. P-38.

[11] It is unclear in this record when the USDE approved the July 1, 2018 State Plan, or whether it is the most recent one. However, Section 300.176(b)(1) of the USDE's Regulations specifies that "policies and procedures submitted by a [s]tate . . . remain in effect until the [s]tate submits to the [USDE] the modifications that the [s]tate determines necessary[,]" 34 C.F.R. § 300.176(b)(1), or the USDE Secretary requires the state to modify its policies and procedures. *See* 34 C.F.R. § 300.176(c).

[12] Although the USDE's June 23, 2023 approval letter, identified as Petitioners' Application Exhibit P-32, does not appear to be attached to the Stipulation or Petitioners' Application with the parties' other exhibits, this Court takes judicial notice that it is publicly available on the Department's official website at www.education.pa.gov/Documents/K-12/Special%20Education/IDEIA-IDEA/Notification%20from%20OSEP.pdf (last visited May 15, 2024). The letter declared: "The [USDE] has determined that Pennsylvania meets the requirements and purposes of Part B of the IDEA." *Id*. at 1.

[13] The parties appear to conflate and/or refer to different documents as the State Plan and the Model Policy. This Court observes that, although they look similar, the documents serve different functions. *See* Petitioners' Appl. Exs. P-23, P-56. In the State Plan, which the Department files with the USDE, the Department confirms its compliance with the IDEA to obtain federal funding. The State Plan incorporates the Model Policy. The Department distributes the

## Age-Out Plan

Relevant to this litigation, Section 1412(a)(1)(A) of the IDEA provides funding to states to offer a FAPE to "all children with disabilities . . . between the ages of 3 and 21, inclusive[.]" 20 U.S.C. § 1412(a)(1)(A). Correspondingly, the General Assembly enacted Section 1301 of the School Code, 24 P.S. § 13-1301, which initially offered a FAPE to every disabled child in Pennsylvania until age 21. *See also* former 22 Pa. Code § 11.12 (affording a FAPE to children with disabilities until they turned 21). However, in 2002, the General Assembly amended Section 1301 of the School Code to **allow eligible students who attain age 21 during a school term to remain in school through the conclusion of that term** (**Age-Out Plan**). *See id.* In 2004, **the Department formally amended Section 11.12 of its Regulations to correspond with the statutory changes to the Age-Out Plan**. *See* 22 Pa. Code § 11.12.

Thus, until August 2023, Sections 300.101 of the Department's Model Policy and the State Plan, declared: "It is the policy of [the Department] that a [FAPE] is available to all children residing in the [s]tate between the ages of 3 and 21, inclusive . . . ." Petitioners' Appl. Exs. P-23 at 3, P-56 at 2. "Therefore, [Pennsylvania] is required to make [a] FAPE available to a child with a disability to the end of the school term in which the student reaches his/her 21st birthday." *Id.* "[The Department also] periodically publishe[d] guidance documents known as

---

Model Policy to LEAs, including Petitioners, as the Department's IDEA-compliant special education plan by which it measures LEA eligibility for a portion of the federal funding.

The Model Policy also differs from the Department's SPP/APR. Although the SPP/APR lists statistical data regarding students served through age 21, it does not expressly reference or incorporate the Model Policy. *See* Stipulations Ex. P-34. According to the USDE's June 23, 2023 State Plan approval letter, its "determination [wa]s based on the totality of [Pennsylvania's] data and information, including the [f]ederal fiscal year [] 2021 [SPP/APR], other [s]tate-reported data, and other publicly available information." Petitioners' Appl. Ex. P-32 at 1, www.education.pa.gov/Documents/K-12/Special%20Education/IDEIA-IDEA/Notification%20from%20OSEP.pdf (last visited May 15, 2024).

8

Basic Education Circulars ([]BEC[]s[]) through which [the Department] interprets and provides guidance regarding public education." Stipulations ¶ 35.

> [The Department's June 1, 2023] BEC entitled "Enrollment of Students" provide[d], in pertinent part:
>
>> Children are considered school age from the time they are admitted to the public school educational program until graduation from high school or the age of 21. . . .
>>
>> For subsidy purposes, **students who reach age 21 after the school term begins are eligible to be counted for the entire school term**.
>
> BEC, <u>Enrollment of Students (pa.gov)</u>.

Stipulations ¶ 36 (emphasis added); *see also* Petitioners' Pet. for Rev. Ex. A at 12-13.

### Facts

On July 11, 2023, A.P., by and through his parents U.P. and M.T., filed a class action complaint against the Department in the U.S. District Court for the Eastern District of Pennsylvania, alleging therein that the Department's "Age-Out [Plan] violate[d] the IDEA by prematurely cutting off the special education services of 21-year-old students[.]" Petitioners' Appl. Ex. P-3 at 1; *see also A.P. v. Pa. Dep't of Educ.*, 2:23-cv-02644-MRP (E.D. Pa., filed July 11, 2023).[14] On August 30, 2023, the Department entered into a Mutual Settlement Agreement and Release (Settlement Agreement) with A.P. in which the Department agreed, beginning with the 2023-2024 school year, to change its Age-Out Plan expiration from the end of the school year in which a child with disabilities turns 21 to his/her 22nd birthday.

---

[14] *See* Petitioners' Appl. Ex. P-1 (*A.P.* Complaint). *A.P.* was discontinued by plaintiff's filing of a notice for voluntary dismissal on September 5, 2023, so it is no longer before the District Court. *See id.* Ex. P-2.

The Settlement Agreement specified, in relevant part:

**WHEREAS**, pursuant to [the IDEA], children with disabilities have a right to receive a [FAPE] until they either earn a regular high school diploma or reach the age of 22, *see* 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.102(a)(3);

. . . .

**WHEREAS**, Section 300.101 of [the Department's Model Policy] terminates the obligation of [LEAs] to provide [a] FAPE to students with disabilities at []the end of the school term in which the student reaches his/her 21[st] birthday[] . . . ;

. . . .

**WHEREAS**, the Parties now seek to settle any and all disputes, claims, or causes of action they have or may have, upon the terms and conditions of this [Settlement] Agreement;

**WHEREAS**, the Parties and their counsel have concluded that the terms of this [Settlement] Agreement are fair, reasonable, adequate, and in the Parties' mutual best interests;

**NOW THEREFORE**, in consideration of the mutual agreements and promises contained in this [Settlement] Agreement, and intending to be legally bound, the Parties hereby agree as follows:

**I.** [**New**] **Age-Out** [**Plan**]

1. [**The Department**] **will rescind and cease implementing and enforcing the** [] **Age-Out** [**Plan**] as it exists in Section 300.101 of its [Model Policy].

2. [The Department] has amended Section 300.101 of its [Model Policy] to reflect that the IDEA requires the Commonwealth of Pennsylvania to provide a FAPE to children with disabilities until their 22nd birthday ("[New] Age-Out [Plan]" . . . .).

10

3. **Immediately upon execution of the [Settlement] Agreement, [the Department] will implement, publish, and enforce the [New] Age-Out [Plan], which will be effective no later than September 5, 2023**.

4. The [New] Age-Out [Plan] will apply to all children with disabilities as defined in [Section 300.8 of the USDE's Regulations,] 34 C.F.R. § 300.8, **including those who turned 21 during or after the 2022-2023 school term**.

Petitioners' Appl. Ex. P-3 at 1-2 (text bold emphasis added). The Settlement Agreement also required the Department to, within 24 hours, post online and send a Notice Letter and Penn Link Communication[15] to parents of children with disabilities who turned 21 during the 2022-2023 school year (or otherwise before the 2023-2024 school year) of their potential eligibility to re-enroll. *Id*. at 2-3. The Department also agreed to notify LEAs and IUs and encourage them to post the New Age-Out Plan on their websites and contact eligible students about re-enrolling. *Id*. at 3.

In accordance with the Settlement Agreement, on August 30, 2023, the Department issued a single-paragraph amendment to the Model Policy as follows:

Revised policy pertaining to [the IDEA] PART B POLICIES AND PROCEDURES UNDER 34 C[.]F[.]R[.] §§ 300.101-300.176, as it will appear in [the Department's Model Policy]:

§ 300.101 - [FAPE]. The Commonwealth of Pennsylvania [(Commonwealth)] ensures that all children with disabilities ages 3 years through 21 years residing in Pennsylvania have the right to a FAPE, including children with disabilities who have been suspended or expelled from school. The Commonwealth shall make [a] FAPE available to a child with a disability eligible under [the] IDEA until the student turns 22. Notwithstanding any other provision of law to the contrary, a child

---

[15] Penn Link is the Department's statewide distribution email service which conveys information rapidly to Pennsylvania LEAs.

> eligible under [the] IDEA who attains the age of [21] years may remain enrolled in their resident district free of charge until their 22nd birthday.

Petitioners' Appl. Ex. P-24; *see also* Petitioners' Appl. Ex. 59 at 3.

That same day, the Department issued a directive through a Penn Link Communication to all of Pennsylvania's LEAs stating:

> Effective no later than September 5, 2023, all students entitled to [a] FAPE and all of the rights and procedural safeguards under the [IDEA] and Chapter 14 of Title 22 of the Pennsylvania Code may remain enrolled in public school until they turn 22 years of age [(New Age-Out Plan)]. This includes students who turned 21 and exited during or after the 2022-2023 school term.

Petitioners' Appl. Ex. D. The Department also sent Notice Letters to families of disabled students and issued FAQs. *See* Petitioners' Appl. Exs. P-25, P-27, Stipulations ¶¶ 51-52. Finally, the Department conducted a webinar PowerPoint presentation for LEAs on August 31, 2023, regarding the New Age-Out Plan. *See* Petitioners' Appl. ¶¶ 48-52, Exs. P-6, P-8.

Importantly, the Department did not notify the LEAs, including Petitioners, of the New Age-Out Plan before it entered into the private Settlement Agreement on August 30, 2023. *See* Stipulations ¶¶ 48-49. Moreover, the "[s]chool districts and [IUs had] adopt[ed] their budgets and set their taxes on or before June 30 each year [(i.e., June 30, 2023)]." Stipulations ¶ 53. Only "LEAs that enroll[ed] students in accordance with the [New Age-Out Plan] [we]re eligible for [s]tate and [f]ederal funds related to those students." Stipulations ¶ 37.

On September 5, 2023, the Central York School District (CYSD) began its 2023-2024 academic school year. Pursuant to the New Age-Out Plan, 21-year-old special needs student Michael Ferro (Ferro) enrolled in school. Three days later, on September 8, 2023, Ferro turned 22 and CYSD expelled him without hearing because he aged out under the Department's New Age-Out Plan. Ferro's family

12

filed a lawsuit in the U.S. District Court for the Middle District of Pennsylvania seeking his reinstatement on the basis that CYSD violated his constitutional rights to due process and equal protection and CYSD's policy by expelling him without a hearing and not allowing him to complete the school year in which he turned 22. *See Ferro v. Cent. York Sch. Dist.*, 1:23-cv-01646-JPW (M.D. Pa. filed Oct. 3, 2023).[16]

On September 11, 2023, Petitioners filed a Petition for Review in this Court's original jurisdiction seeking declaratory and injunctive relief,[17] asserting therein that the Department's reinterpretation of the IDEA in the New Age-Out Plan illegally requires Pennsylvania LEAs to provide a FAPE until a student's 22nd birthday (rather than through the end of the school term in which the student reaches

---

[16] *See* Petitioners' Appl. Ex. P-29 (*Ferro* Complaint).  Because the District Court remanded *Ferro* to the York County Common Pleas Court on October 10, 2023, it is no longer before the District Court for disposition.

[17] In Count I of Petitioners' Petition for Review, Petitioners seek a declaration that the Department has: (1) violated the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602, and 45 Pa.C.S. §§ 501-907; (2) violated the Regulatory Review Act, Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-745.14; (3) the New Age-Out Plan violates Section 1301 of the School Code; (4) the New Age-Out Plan violates Section 11.12 of the Department's Regulations; (5) the New Age-Out Plan is not valid for any reason; (6) by adopting and attempting to enforce the New Age-Out Plan, the Department violated its duty to administer Section 1301 of the School Code and Section 11.12 of the Department's Regulations; and (7) public school districts, IUs, and vocational-technical schools are not required to comply with the New Age-Out Plan.

In Count II, Petitioners request that this Court enjoin the Department from: (1) taking any action purporting to enforce the New Age-Out Plan or requiring school districts, IUs, or vocational-technical schools to comply with the New Age-Out Plan; (2) taking any action to continue to issue or distribute the New Age-Out Plan in any format; and (3) taking any action to implement a Settlement Agreement against school districts, IUs, or area vocational-technical schools.  Petitioners further seek an Order from this Court: (1) directing the Department to enforce Section 1301 of the School Code and Section 11.12 of the Department's Regulations as written; (2) directing the Department to withdraw the Penn Link Communication regarding the Age-Out Plan and post on its website that the Penn Link Communication is withdrawn and of no effect; and (3) enjoining the Department from taking any action in the future to attempt to change the Age-Out Plan through the settling of litigation without complying with applicable legal processes and applicable law.

21 years of age), and that the Department's actions violate the School Code and the Department's Regulations. Specifically, Petitioners allege that the New Age-Out Plan is a regulation under the Commonwealth Documents Law (CDL),[18] and that the Department did not follow the required rulemaking procedures to implement it, nor did it submit it to the Legislative Reference Bureau as required by the Regulatory Review Act (RRA).[19] According to Petitioners, because they did not have prior notice of the New Age-Out Plan, they did not budget for the new, additional services they would need to provide to eligible students, and they are now ineligible for related funding.

Petitioners also filed an Application for Special Relief seeking a preliminary injunction on the basis that the Department's implementation of the New

---

[18] Section 102(12) of the CDL defines *regulation* as "any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency." 45 P.S. § 1102(12). Section 201 of the CDL requires that an agency must give "public notice of its intention to promulgate, amend[,] or repeal any administrative regulation." 45 P.S. § 1201. Section 201 of the CDL adds that the notice shall include: (1) the text of the proposed regulation[;] (2) a statement of the statutory authority under which it is promulgated[;] (3) a brief explanation of the proposed regulation[;] and (4) a request for written comments by any interested person concerning the proposed regulation or change therein. *See id*.

[19] *Regulation* is defined in Section 3 of the RRA as

> [a]ny rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency or amending, revising[,] or otherwise altering the terms and provisions of an existing regulation, or prescribing the practice or procedure before such agency. . . . The term shall not include a proclamation, executive order, directive[,] or similar document issued by the Governor, but shall include a regulation which may be promulgated by an agency, only with the approval of the Governor.

71 P.S. § 745.3. Section 5 of the RRA requires that, on the same day the "agency submits a proposed regulation to the Legislative Reference Bureau for publication of notice of proposed rulemaking in the Pennsylvania Bulletin as required by the [CDL,]" it must also submit it to the Independent Regulatory Review Commission for analysis. 71 P.S. § 745.5.

Age-Out Plan violated state law, including the School Code. The Department filed an answer in opposition to Petitioners' Application for Special Relief.

On September 29, 2023, the Department filed Preliminary Objections to the Petition for Review, which included a challenge to the Court's subject matter jurisdiction. Petitioners filed an answer in opposition to the Preliminary Objections. On November 6, 2023, in anticipation of a hearing on Petitioners' Application for Special Relief, both parties filed extensive exhibit and witness lists identifying numerous factual witnesses.[20] On November 8, 2023, the parties filed a Joint Status Report indicating their intention to file the Stipulations, which they did on November 10, 2023. *See* Stipulations. On November 14, 2023, the parties argued their respective positions on Petitioners' Application for Special Relief before this Court. As memorialized in this Court's November 14, 2023 Order, Petitioners agreed to withdraw their Application for Special Relief (which they did on November 17, 2023), and the parties agreed to file the Cross-Applications.

On November 28, 2023, the Department withdrew its Preliminary Objections. Also on November 28, 2023, pursuant to this Court's November 14, 2023 Order, Petitioners and the Department filed the Cross-Applications. The parties have filed supporting and opposing briefs related to their Cross-Applications. Therein, the Department argues that it is entitled to judgment in its favor because: there is not an actual controversy for which this Court can grant Petitioners declaratory relief; Petitioners lack standing; Petitioners have not exhausted their administrative remedies; and Petitioners failed to state a valid legal claim for which

---

[20] On November 6, 2023, Students and Parents, Advocates, Inc., the Education Law Center, and the Juvenile Law Center filed an Application for Leave to File an *Amici Curiae* brief in support of the Department's opposition to Petitioners' Application for Special Relief. The students and parents seeking *amici curiae* status are the named plaintiffs in the *A.P.* matter. By November 14, 2023 Order, under which Petitioners agreed to withdraw their Application for Special Relief, the Application for Leave to File an *Amici Curiae* brief was denied as moot.

relief may be granted because the Department's implementation of the New Age-Out Plan did not violate the RRA or CDL. Petitioners assert that they have presented an actual controversy; they have standing; they have not failed to exhaust their administrative remedies; and their right to relief is clear because the Department's implementation of the New Age-Out Plan violated the RRA and CDL. The Cross-Applications are now ripe for this Court's decision.

On December 29, 2023, J.N., E.N., A.P., U.P., M.T., the Council of Parent Attorneys and Advocates, Inc., the Education Law Center, and Juvenile Law Center (collectively, Amici)[21] filed an application for leave to file an *amici curiae* brief in support of the Department, which this Court granted on January 22, 2024. On February 7, 2024, this *en banc* Court heard oral argument on the Cross-Applications.

## Discussion

Initially,

> [t]he standard for granting summary relief turns upon whether the applicant's right to relief is clear. Summary relief on a petition for review is similar to the relief provided by a grant of summary judgment. [*See*] [Pennsylvania Rule of Appellate Procedure (]Pa.R.A.P.[)] 1532, Official Note. Summary judgment is appropriate where, after the close of pleadings, "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa.R.C[iv].P. 1035.2(a). The record is to be viewed in the light most favorable to the nonmoving party, and all doubts as to the

---

[21] The amici are two disabled students and their families that previously resolved their litigation against the Department by entering into the Settlement Agreement requiring the Department to comply with the IDEA provision mandating a FAPE for disabled students until their 22nd birthday and three not-for-profit organizations that advocate for the educational rights of individuals with disabilities and their families. *See* Amici Appl. ¶ 3.

16

> existence of a genuine issue of material fact must be resolved against the moving party.

*Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017) (footnote omitted).

There are no genuine issues of material fact in the instant matter as to any necessary element of Petitioners' cause of action.[22] Moreover, "[a] determination as to whether a particular statement of policy is an unpromulgated regulation is a question of law." *Eastwood Nursing & Rehab. Ctr. v. Dep't of Pub. Welfare*, 910 A.2d 134, 141 (Pa. Cmwlth. 2006).

## 1. Actual Controversy

The Department argues in its Application that there is not an actual controversy for which this Court can grant Petitioners declaratory relief because Petitioners are not subject to imminent enforcement of the New Age-Out Plan. The Department specifically contends that, because Petitioners are not required to implement the New Age-Out Plan and, thus, are not subject to imminent enforcement, there is no actual controversy. Rather, the Department asserts that Petitioners can choose not to act, which would only be a failure to comply with federal law, not the School Code or the Department's Regulations. Petitioners rejoin that, considering the Settlement Agreement's terms and conditions, the change and legal effect of the New Age-Out Plan, and how special education hearing officers and Department staff will enforce the New Age-Out Plan, the Department's claims that it merely issued advice or guidance lack merit and are disingenuous.

---

[22] *See* Department Appl. at 12. The Department contends that Petitioners incorporate and rely on disputed facts and documents - specifically, the unsworn affidavits and emails attached to Petitioners' Application - which are not properly before this Court. This Court observes that, although the parties stipulated "that [Petitioners' exhibits] are authentic copies of the documents that they purport to be," Stipulations ¶ 4, they did not stipulate to their relevancy or admissibility. However, because the Cross-Applications present a question of law, this Court need not rely upon those documents to reach a decision. Accordingly, there are no genuine issues of material fact.

"Declaratory judgments are . . . judicial searchlights, switched on at the behest of a litigant to illuminate an existing legal right, status or other relation." *Selective Way Ins. Co. v. Hosp. Grp. Servs., Inc.*, 119 A.3d 1035, 1046 (Pa. Super. [] 2015) (quoting *Wagner v. Apollo Gas Co.*, . . . 582 A.2d 364, 365 ([Pa. Super.] 1990) (citation omitted)) (footnote omitted). They are governed by the provisions of the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541.

> The purpose of the Declaratory Judgments Act "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and [it] is to be liberally construed and administered."[23] 42 Pa.C.S. § 7541. Declaratory judgment as to the rights, status or legal relationships is appropriate only where an actual controversy exists. *McCord v. Pennsylvanians for Union Reform*, 136 A.3d 1055 (Pa. Cmwlth. 2016). "An actual controversy exists when litigation is both imminent and inevitable and the declaration sought will practically help to end the controversy between the parties." *Id*. at 1061 (quotation omitted).

*Eleven Eleven Pa., LLC v. Commonwealth*, 169 A.3d 141, 145 (Pa. Cmwlth. 2017); *see also Off. of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014) ("[T]he courts of this Commonwealth are generally proscribed from rendering decisions in the abstract or issuing purely advisory opinions.").

However, the Declaratory Judgments Act is to be liberally construed, *see* 42 Pa.C.S. § 7541(a), and "[t]he subject matter of the dispute giving rise to a request for declaratory relief need not have erupted into a full-fledged battle . . . ." *Pa. Game Comm'n v. Seneca Res. Corp.*, 84 A.3d 1098, 1103 (Pa. Cmwlth. 2014) (quoting *Ronald H. Clark, Inc. v. Twp. of Hamilton*, . . . 562 A.2d 965, 968 ([Pa. Cmwlth.] 1989)).

---

[23] "The declaration may be either affirmative or negative in form and effect, and . . . shall have the force and effect of a final judgment or decree." 42 Pa.C.S. § 7532.

[O]ur Supreme Court has said:

> 'If differences between the parties concerned, as to their legal rights, have reached the state of antagonistic claims, which are being actively pressed on one side and opposed on the other, an actual controversy appears; where, however, the claims of the several parties in interest, while not having reached the active stage, are nevertheless present, and indicative of threatened litigation in the immediate future, which seems unavoidable, the ripening seeds of a controversy appear.'

*Pa. Game Comm'n*, 84 A.3d at 1103-04 (quoting *Mid-Centre Cnty. Auth. v. Boggs Twp.*, 384 A.2d 1008, 1011 (Pa. Cmwlth. 1978)). Therefore, while an issue giving rise to a request for a declaratory judgment must be justiciable, it need not be in litigation. *See Pa. Game Comm'n*. Moreover, the Pennsylvania Supreme Court has concluded that a question of law, like that presented here, is "particularly well-suited for pre-enforcement review." *Yocum v. Pa. Gaming Control Bd.*, 161 A.3d 228, 237 (Pa. 2017) (quoting *Robinson Twp., Wash. Cnty. v. Commonwealth of Pa.*, 83 A.3d 901, 917 (Pa. 2013)).

Important here, neither the CDL nor the RRA offer administrative pre-enforcement processes by which Petitioners may challenge violative regulations.[24] The Pennsylvania Supreme Court has ruled:

> [W]here statutory remedies are unavailable or inadequate, a pre-enforcement regulatory challenge [i]s appropriate where there [i]s a direct and immediate regulatory impact on the governed industry, and a petitioner alleged it would suffer ongoing uncertainty . . . and would sustain substantial expense complying with the challenged

---

[24] The Department offers that if Petitioners wish to advance their own interpretation of the IDEA, "they are free to do so via contesting students' claims for services, or . . . through an appeal [of a Department or USDE] action." Department Appl. at 21. However, in the Petition for Review, Petitioners do not challenge the IDEA but, rather, whether the Department implemented its New Age-Out Plan in accordance with Pennsylvania law.

regulations while it proceeded through the administrative process[.]

*Bayada Nurses, Inc. v. Dep't of Lab. & Indus.*, 8 A.3d 866, 875 (Pa. 2010). "Where the effect of the challenged regulations upon the industry regulated is direct and immediate, the hardship thus presented suffices to establish the justiciability of the challenge in advance of enforcement." *Arsenal Coal Co. v. Commonwealth*, 477 A.2d 1333, 1339 (Pa. 1984).

> The *Arsenal Coal* Court held:
>
> [The a]ppellants may refuse to comply and test the regulations by appealing, . . . or by defending actions imposing sanctions for non-compliance. This proposed avenue of review is beset with penalties and impediments . . . rendering it inadequate as a satisfactory alternative to the equitable action initiated under the original jurisdiction of [the] Commonwealth Court.
>
> The alternative to challenging the regulation through noncompliance is to submit to the regulations. We cannot say that the burden of such a course is other than substantial . . . . [The a]ppellants have alleged that the regulations require the expenditure of substantial sums to comply which, while not immediately calculable, will substantially impair the cash flow of all [the a]ppellants. Whether or not this allegation is true, it is clear that if [the a]ppellants elect to comply and await judicial determination of validity in subsequent piecemeal litigation, the process would be costly and inefficient.

*Id.* at 1340 (citation omitted); *see also Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 483 (Pa. 2021) (*FOAC II*) (quoting *Robinson Twp. v. Commonwealth*, 83 A.3d at 924) ("[E]xisting jurisprudence permits pre-enforcement review of [regulatory] provisions in cases in which petitioners must choose between equally unappealing options and where the third option, here refusing to provide [children a FAPE to which they are entitled], is equally undesirable."). Ultimately, "whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter

20

of sound judicial discretion." *Brouillette v. Wolf*, 213 A.3d 341, 357 (Pa. Cmwlth. 2019); *see also Pa. Game Comm'n*.

In the instant matter, Petitioners clearly alleged in the Petition for Review that the Department's implementation of the New Age-Out Plan has harmed them in terms of the unanticipated number of students who could return to school, and the associated costs and expenses for which they risk losing federal funding. *See* Petition for Review ¶¶ 6, 11, 17, 21. The Department has not denied Petitioners' averments.[25] Because the Department did not deny Petitioners' averments, they are deemed admitted. The parties also stipulated to such facts.[26] *See* Stipulations ¶¶ 13-14, 20-21, 24, 27.

Moreover, even if, as the Department represents, Petitioners were not obligated to comply with the New Age-Out Plan, at least one of the Petitioners, Upper Darby School District, declares that it re-enrolled affected students for the 2023-2024 school year "believing that it was required to do so by the [Department's S]ettlement [Agreement]." Stipulations ¶ 25. The Department does not claim that any of Petitioners failed to agree to or comply with the Model Policy. Further, during the February 7, 2024 oral argument before this *en banc* Court, Petitioners' counsel represented that Petitioners desired to and did implement the New Age-Out Plan for

___

[25] The Department did not file an answer to the Petition for Review. Rather, the Department filed the Preliminary Objections which it withdrew despite that the November 14, 2023 Order specified that this Court would rule on the Preliminary Objections with the Cross-Applications. The Department did not file an answer to the Petition for Review, but filed the Department's Application. "Averments in a pleading to which a responsive pleading is required are admitted when not denied specifically or by necessary implication." Pa.R.Civ.P. 1029(b).

[26] The parties stipulated that Petitioner School District of Pittsburgh readmitted 5 students who would turn 22 during the 2023-2024 school year, the cost of providing a FAPE for whom was estimated at $225,000.00 (*see* Stipulations ¶¶ 13-14); Petitioner Central Bucks School District readmitted 14 students who would turn 22 during the 2023-2024 school year, the cost of providing a FAPE for whom was estimated at $590,000.00 (*see* Stipulations ¶¶ 20-21); and Petitioner Upper Darby School District readmitted 3 students who would turn 22 during the 2023-2024 school year, the cost of providing a FAPE for whom was estimated at $70,000.00 (*see* Stipulations ¶¶ 24, 27).

21

the 2023-2024 school year to continue to offer support to eligible students and their families.[27]  To do so, Petitioners had only days to implement the New Age-Out Plan, long after they adopted their 2023-2024 school year budgets, and they understood that they are only eligible for federal funding if they complied with the Department's newly-amended Model Policy.  *See* Stipulations ¶¶ 37, 47-54.

In addition, in Section 300.175 of both the Model Policy and the State Plan, the Department admitted that it does not offer a FAPE directly.  *See* Petitioners' Appl. Exs. P-23 at 49, P-56 at 49.  Rather, the Department supervises LEAs that provide a FAPE to children with disabilities.  *See* 22 Pa. Code § 14.102(b).  In Section 300.149 of the Model Policy and the State Plan, the Department explains:

> [The Department] is responsible for ensuring that the requirements of [the] IDEA are carried out and that each educational program for children with disabilities administered within [Pennsylvania], including each program administered by any other [s]tate or local agency[,] is under the general supervision of the persons responsible for educational programs for children with disabilities in the Commonwealth and meets the education standards of the [Department] (including the requirements of 34 C[.]F[.]R[.] Part 300).  [The Department] complies with this section through [Chapters 14 and 711 of its Regulations, 22 Pa. Code Chs. 14 (relating to special education services), 711 (relating to charter and cyber charter school services for disabled children)], [Sections 1357, 1372, and 2552 of the] School Code[,] 24 P.S. §§ 13-1357 [(relating to withholding state appropriations from school districts for failing to comply with attendance requirements)], 13-1372 [(relating to exceptional children)], and 25-2552 [(relating to withholding state appropriations from school districts for failing to comply with state laws and regulations)]), Memorandum of Understanding [among] Pennsylvania's Departments of Education, Human Services, Labor and Industry and

---

[27] Notably, the Department represents in the Model Policy to the LEAs and in the State Plan to the USDE that an eligible child will receive a FAPE in a least restrictive environment even pending ongoing funding disputes.  *See* Petitioners' Appl. Exs. P-23 at 4, P-56 at 3.

22

Health, and [the Department's] [s]tatewide [LEA] monitoring system . . . .

Petitioners' Appl. Exs. P-23 at 33, P-56 at 33. Thus, under the Model Policy and the State Plan, the Department has the authority and methods in place to bring enforcement actions against LEAs that do not immediately comply with the New Age-Out Plan.[28]

> Based on the above, this Court holds that
>
> the asserted impact of the [New Age-Out Plan] in the instant case is sufficiently direct and immediate to render the issue appropriate for judicial review; the lengthy process by which the validity of the [New Age-Out Plan] will be addressed on a basis of application to the litigant would result in ongoing uncertainty in the day[-]to[-]day business operations of an industry which the General Assembly clearly intended to protect from unnecessary upheaval.

*Arsenal Coal*, 477 A.2d at 1339-40. Accordingly, Petitioners have pled an actual controversy.

## 2. Standing

The Department further claims in its Application that Petitioners lack standing. It avers that because the New Age-Out Plan places no legal burden on Petitioners, and none of them have been aggrieved by the Department's communications regarding the New Age-Out Plan, they do not have a substantial,

---

[28] LEAs that do not immediately comply with the New Age-Out Plan are also subject to formal complaints that parents may file under Sections 300.151 through 300.153 of the Model Policy and the State Plan. *See* Petitioners' Appl. Exs. P-23 at 36-38, P-56 at 36-38; *see also G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015) ("To the extent a school district fails to provide a student with a FAPE, a parent may file a due process complaint on behalf of his or her child, with a subsequent hearing held before an administrative hearing officer. 20 U.S.C. § 1415(b)(6), (f)(1)(A)[.]").

direct, and immediate interest in this case. Petitioners respond that, for the reasons presented above in support of an actual controversy, they have standing.

"Standing is [also] a justiciability concern, implicating a court's ability to adjudicate a matter."[29] *FOAC II*, 261 A.3d at 481. "In seeking judicial resolution of a controversy, a party must establish as a threshold matter that he has standing to maintain the action." *Stilp v. Gen. Assembly*, 940 A.2d 1227, 1233 (Pa. 2007). "[T]he core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not aggrieved thereby and has no standing to obtain a judicial resolution of his challenge." *Fumo v. City of Phila.*, 972 A.2d 487, 496 (Pa. 2009). "An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct[,] and immediate interest in the outcome of the litigation." *Id.*

> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018) (citations omitted). "Under Pennsylvania law, the doctrine of standing is 'a prudential, judicially[]created tool,' affording discretion to courts." *FOAC II*, 261 A.3d at 481 (quoting *In re Hickson*, 821 A.2d 1238 (Pa. 2003)).

---

[29] [T]his Court has noted that the justiciability doctrines of standing and ripeness are closely related because both may encompass allegations that the plaintiff's harm is speculative or hypothetical and resolving the matter would constitute an advisory opinion. However, ripeness is distinct from standing as it addresses whether the factual development is sufficient to facilitate a judicial decision.

*FOAC II*, 261 A.3d at 482 (citations omitted).

In addition, "[u]nder Pennsylvania law, an association [like PSBA] has standing as representative of its members to bring a cause of action even in the absence of injury to itself, if [it] alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged." *Robinson Twp.*, 83 A.3d at 922; *see also Friends of Lackawanna v. Dunmore Borough Zoning Hearing Bd.*, 186 A.3d 525 (Pa. Cmwlth. 2018).

In the Petition for Review, Petitioners assert:

> 5. PSBA brings this action because of the significant adverse effects the [Department's] actions to change the [e]xisting Age-Out [Plan] from age 21 to a New Age-Out [Plan] of age 22 are having and will have on its members.
>
> 6. PSBA's members will be adversely affected by the [Department's] illegal actions as more thoroughly stated herein. The [Department's] actions, if implemented, will impose significant cost and expense, potentially in the amount of millions of dollars, to school districts, [IUs], vocational-technical schools, and their taxpayers – all in violation of state law and without compliance with required procedures and processes.
>
> . . . .
>
> 8. Among PSBA's interests is fostering good governance and ensuring compliance with such governance laws as the [CDL] and the [RRA].

Petition for Review ¶¶ 5-6, 8. In the absence of the Department's express denial of the above allegations, and because the Department does not otherwise challenge PSBA's standing on the basis that none of its members is suffering immediate or threatened injury due to the New Age-Out Plan, to the extent that the School District Petitioners have standing in this matter, the PSBA has associational standing.

As described above regarding an actual controversy, the School District Petitioners' interest is direct and immediate. "It makes little sense to wait for [petitioners] to break the law, which we presume they do not want to do, before they

25

can challenge it." *Firearm Owners Against Crime v. City of Harrisburg*, 218 A.3d 497, 513 (Pa. Cmwlth. 2019) (*en banc*), *aff'd*, *FOAC II*; *see also Arsenal Coal*. Therefore, this Court must determine whether the School District Petitioners have a substantial interest in the outcome of this litigation that "surpasses the common interest of all citizens in procuring [the Department's] obedience to the law." *Phantom Fireworks*, 198 A.3d at 1215.

This Court observes that, while there is certainly a common interest of all Pennsylvania taxpayers in assuring obedience with the IDEA,[30] the School District Petitioners' interests surpass that of ordinary citizens in procuring the Department's obedience with the CDL and RRA.[31] "Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly[.]" *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 292 A.3d 921, 927 (Pa. 2023) (quoting *Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 66 A.3d 301, 310 (Pa. 2013)). The CDL and the RRA set forth the General Assembly's agency rulemaking procedures.[32]

---

[30] School districts have the option of increasing taxes for budget shortfalls if the Department withholds their federal funding.

[31] The cases the Department cites in support of its claim that LEAs do not have standing to directly challenge the IDEA are inapposite. Here, Petitioners are not challenging the IDEA but, rather, whether the Department implemented its New Age-Out Plan in accordance with Pennsylvania law. It appears to this Court that Petitioners do not desire to skirt any legal obligations, but intend to provide disabled students all FAPE to which they may be entitled. In the Petition for Review, Petitioners merely seek to have this Court declare whether the Department may implement and enforce the New Age-Out Plan via the Settlement Agreement (and the interpretive Model Policy, Notice Letter, Penn Link Communication, BEC, PowerPoint presentation, FAQs, etc.) while not complying with the CDL and the RRA.

[32] The CDL specifies that agencies must give public notice of the rule; cite the authority for promulgation; provide a brief explanation of the rule; request written comments from interested persons; and include other statutorily required statements. *See* Section 201 of the CDL, 45 P.S. § 1201; *see also* Sections 7.1 through 7.10 of the Joint Committee on Documents' Regulations, 1 Pa. Code §§ 7.1-7.10. The proposed regulation must also be published in the Pennsylvania

> In essence, [the CDL] procedures require an agency to give notice to the public of its proposed rule-making and an opportunity for the public to comment. . . . The agency must also obtain the approval of the Attorney General and the General Counsel of a proposed regulation's form and legality. Finally, an agency's regulation must also undergo legislative scrutiny in accordance with the [RRA].[33]

*Borough of Bedford v. Dep't of Env't Prot.*, 972 A.2d 53, 62 (Pa. Cmwlth. 2009) (citation and footnote omitted).

This Court has explained that the CDL "provides an important safeguard against the unwise or improper exercise of discretionary administrative power and includes public notice of a proposed rule, request for written comments, consideration of such comments, and hearings as appropriate." *Commonwealth v. Colonial Nissan, Inc.*, 691 A.2d 1005, 1009 (Pa. Cmwlth. 1997). The General Assembly enacted the RRA for "oversight and review of [administrative] regulations . . . in order to curtail excessive regulation and to require the executive branch to justify its exercise of the authority to regulate before imposing hidden costs upon the

---

Bulletin. *See id*. at § 7.1. Like the CDL, the RRA imposes a "mandatory, formal rulemaking procedure," *Corman v. Acting Sec'y of Pa. Dep't of Health*, 267 A.3d 561, 572 (Pa. Cmwlth.), *aff'd*, 268 A.3d 1080 (Pa. 2021) (quoting *Naylor v. Dep't of Pub. Welfare*, 54 A.3d 429, 433 (Pa. Cmwlth. 2012), *aff'd*, 76 A.3d 536 (Pa. 2013)), that includes publication of notice, with the text, explanation, authoritative citations, statement of need, estimated direct and indirect costs, identification of affected parties, and the financial, economic, and social impact on individuals, businesses, and communities, etc. *See* Section 5 of the RRA. Limited exceptions to the formal rulemaking process do exist, like the Governor exercises a valid use of police power, "upon the declaration or proclamation of a disaster emergency pursuant to the Emergency [Management Services] Code, 35 Pa.C.S. § 7301(c)." *Corman*, 267 A.3d at 574. Additionally, notice may be waived under Section 204(3) of the CDL, if such notice would be "impracticable, unnecessary, or contrary to the public interest." 45 P.S. § 1204(3). The Department did not make any finding that complying with the CDL was impractical, unnecessary, or contrary to the public interest in this instance.

[33] Accordingly, Section 300.150 of the Model Policy and the State Plan put Petitioners on notice that the Department's "[R]egulations provide enforceable policies and procedures and are made known through the public participation adoption of rules[,]" and that "[s]tate law requires public notice in the . . . Pennsylvania Bulletin." Petitioners' Appl. Exs. P-23 at 35, P-56 at 35.

economy of Pennsylvania." *Corman v. Acting Sec'y of Pa. Dep't of Health*, 267 A.3d 561, 573 n.20 (Pa. Cmwlth.), *aff'd*, 268 A.3d 1080 (Pa. 2021) (quoting Section 2(a) of the RRA, 71 P.S. § 745.2(a)). Thus, adherence with the CDL and the RRA is paramount when an agency, like the Department, intends to legally bind regulated entities, like Petitioners.

In this case, responsibility for providing a FAPE to children with disabilities falls upon Pennsylvania school districts. For more than two decades, Section 1301 of the School Code and Section 11.12 of the Department's Regulations declared that children with disabilities shall receive a FAPE until the end of the school year in which they turn 21. *See* 24 P.S. § 13-1301; 22 Pa. Code § 11.12. The Department made identical representations in its BECs, in its Model Policy that Petitioners agreed to follow, and in its USDE-approved State Plan. Petitioners, relying upon those statutory, regulatory, and documentary representations, annually planned ahead and budgeted to educate their eligible students accordingly. However, in August 2023, based solely upon the Settlement Agreement, the Department gave LEAs a mere six days' notice that, to comply with the Model Policy and State Plan and to continue to receive federal funding, they would have to offer a FAPE to eligible students until their 22nd birthdays with unbudgeted funds. Under these circumstances, the School District Petitioners' interest in securing the Department's obedience to the CDL and the RRA, to the extent it was required, surpasses the abstract interests of all citizens. Accordingly, the School District Petitioners and, by extension, the PSBA, have a substantial interest in the outcome of this litigation.

Because Petitioners have a substantial, direct, and immediate interest in the outcome of this litigation, they have standing.

### 3. Exhaustion of Administrative Remedies

The Department further contends in its Application that Petitioners can and must utilize their administrative remedies to assert their position regarding the IDEA's requirements, rather than engaging an end around challenge to the Department's actions. Petitioners retort that the Pennsylvania Supreme Court rejected such arguments relative to the CDL and RRA in *Arsenal Coal*.

"[A]s a general proposition, litigants are required to exhaust adequate and available administrative remedies prior to resorting to judicial remedies." *Bayada Nurses*, 8 A.3d at 875. This Court has explained:

> The doctrine of exhaustion of administrative remedies is intended to prevent the premature interruption of the administrative process, which would restrict the agency's opportunity to develop an adequate factual record, limit the agency in the exercise of its expertise[,] and impede the development of a cohesive body of law in that area. It is appropriate to defer judicial review when the question presented is within the agency's specialization and when the administrative remedy is as likely as the judicial remedy to provide the desired result. However, the exhaustion doctrine is not so inflexible as to bar legal or equitable jurisdiction where . . . the remedy afforded through the administrative process is inadequate.

*Hoke ex rel Reidenbach v. Elizabethtown Area Sch. Dist.*, 833 A.2d 304, 309 (Pa. Cmwlth. 2003).

> For example,

> 'an administrative remedy is inadequate if it either: (1) does not allow for adjudication of the issues raised . . .[;] or (2) allows irreparable harm to occur to the plaintiffs during the pursuit of the statutory remedy.' [*Commonwealth ex rel. Nicholas v. Pa. Lab*[.] *Rel*[*s.*] *Bd.*, . . .] 681 A.2d [157,] 161 [(Pa. 1996)].

*Propel Charter Sch. V. Dep't of Educ.*, 243 A.3d 322, 327 (Pa. Cmwlth. 2020) (quoting *Keystone ReLeaf LLC v. Dep't of Health*, 186 A.3d 505, 517 (Pa. Cmwlth.

2018)). Moreover, "exhaustion is not a necessary prerequisite for obtaining judicial review if '[the challenged administrative] regulation itself causes actual, present harm' prior to its enforcement. *Concerned Citizens* [*of Chestnuthill Twp. V. Dep't of Env't Res.,* . . . 632 A.2d [1,] 3 [[Pa Cmwlth.] (1993)]." *McNew v. E. Marlborough Twp.*, 295 A.3d 1, 11 (Pa. Cmwlth. 2023) (quoting *Pocono Manor Invs., LP v. Dep't of Env't Prot.*, 212 A.3d 112, 116 (Pa. Cmwlth. 2019)).

As stated above, neither the CDL nor the RRA offer administrative processes in which Petitioners may challenge the New Age-Out Plan as a violative regulation, and it has caused actual, present harm to Petitioners. Neither submitting to a noncompliant regulation nor defending an enforcement action after refusing to comply are satisfactory means for Petitioners to challenge the Department's actions. *See Arsenal Coal*. Accordingly, Petitioners have not failed to exhaust their administrative remedies.

### 4. Right to Relief

The Department argues in its Application that because the New Age-Out Plan is not mandatory for Petitioners and does not create a new rule or requirement but, rather, merely re-interprets the IDEA, it is not a regulation requiring compliance with the CDL's and RRA's rulemaking processes.[34] Petitioners assert in their Application that the Department changed the Age-Out Plan via the Settlement Agreement without complying with the CDL and RRA rulemaking procedures.

---

[34] The Amici arguments favor the Department, but primarily focus on whether state and federal law require LEAs to provide a FAPE to students with disabilities until they turn 22, and whether Petitioners should be allowed to skirt a federally-imposed legal obligation to deny disabled students a FAPE to which they are entitled. However, Petitioners' challenge is to the *manner* in which the Department issued the New Age-Out Plan, not to whether the IDEA mandates the New Age-Out Plan.

30

The Pennsylvania Supreme Court has explained:

When an agency . . . promulgates published regulations through the formal notice, comment, and review procedures prescribed in [the CDL and the RRA], its resulting pronouncements are accorded the force of law and are thus denominated "legislative rules." *See Borough of Pottstown* [*v. Pa. Mun. Ret. Bd.*], . . . 712 A.2d [741,] 743 [(Pa. 1998)]. *See generally* Mark Seidenfeld, *Substituting Substantive for Procedural Rev*[.] *of Guidance Documents*, 90 TEX. L.REV. 331, 335 (2011) ("The canonical mode by which agencies define the meaning of statutes and regulations or establish policy is legislative rulemaking.") (footnote omitted).

Non-legislative rules – more recently couched (in decisions and in the literature) as "guidance documents" – comprise a second category of agency pronouncements recognized in administrative law practice. These "come in an abundance of formats with a diversity of names, including guidances, manuals, interpretive memoranda, staff instructions, policy statements, circulars, bulletins, advisories, press releases[,] and others." Robert A. Anthony, Commentary, *A Taxonomy of Fed*[.] *Agency Rules*, 52 ADMIN. L.REV. 1045, 1046 (2000). When such documents fairly may be said to merely explain or offer specific and conforming content to existing statutes or regulations within the agency's purview, they are regarded as "interpretive rules," which generally are exempt from notice-and-comment rulemaking and regulatory-review requirements. *See Borough of Pottstown*, . . . 712 A.2d at 743; Seidenfeld, *Substituting Substantive for Procedural Rev*[.], 90 TEX. L.REV. at 346 (explaining that an interpretive rule "is meant to explain preexisting legal obligations and relations that are embodied in the agency's authorizing statutes and regulations") (footnote omitted). Additionally, "statements of policy" – or agency pronouncements which are not intended to bind the public and agency personnel, but rather, merely express an agency's tentative, future intentions – also are not regulations subject to notice-and-comment rulemaking

and regulatory-review requirements. *See Borough of Pottstown*, . . . 712 A.2d at 743 n.8.

*Nw. Youth Servs.*, 66 A.3d at 310-11 (internal citation omitted). Thus, applicability of the formal rulemaking process in the instant case depends upon whether the New Age-Out Plan is a legislative rule/regulation or an interpretive rule/statement of policy.

The Department refers to the New Age-Out Plan as a statement of policy. However, "the agency's characterization of its own rule as a statement of policy 'is by no means dispositive on the issue'" of whether it is a regulation or a statement of policy. *Eastwood*, 910 A.2d at 146 (quoting *R.M. v. Pa. Hous. Fin. Agency*, 740 A.2d 302, 307 (Pa. Cmwlth. 1999)). Rather, Pennsylvania courts look to whether the agency's action has the effect of a binding norm. *See Eastwood*.

Generally, "a regulation has the effect of a 'binding norm[,]'" *Transp. Servs., Inc. v. Underground Storage Tank Indemnification Bd.*, 67 A.3d 142, 154 (Pa. Cmwlth. 2013), which "means that the agency is bound by the statement until the agency repeals it . . . ." *Id.* at 155 (quoting *Home Builders Ass'n of Chester & Del. Counties v. Dep't of Env't Prot.*, 828 A.2d 446, 451 (Pa. Cmwlth. 2003)). "A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications[,]" *Corman*, 267 A.3d at 574 (quoting *Pa. Hum. Rels. Comm'n v. Norristown Area Sch. Dist.*, 374 A.2d 671, 679 (Pa. 1977)), but "leaves the agency with discretion to deviate from its terms." *Transp. Servs.*, 67 A.3d at 155.

> Our Supreme Court has adopted the three-part "binding norm" test articulated by the Court of Appeals for the District of Columbia to determine whether an order issued by an agency amounts to a regulation requiring adherence to formal rulemaking processes. *See Pa. Hum. Rels. Comm'n*, 374 A.2d at 679. Pursuant to this test,

32

> [i]n ascertaining whether an agency has established a binding norm, the reviewing court must consider: (1) the plain language of the provision; (2) the manner in which the agency has implemented the provision; and[] (3) whether the agency's discretion is restricted by the provision.

> *Eastwood* . . . , 910 A.2d [at] 144 . . . .

*Corman*, 267 A.3d at 575.

a. Plain Language

The Department contends that Petitioners are not required to follow the New Age-Out Plan. However, in the New Age-Out Plan in Section 300.101 of the Model Policy, the Department declares:

> The Commonwealth shall make [a] FAPE available to a child with a disability eligible under [the] IDEA until the student turns 22. Notwithstanding any other provision of law to the contrary, a child eligible under [the] IDEA who attains the age of [21] years may remain enrolled in their resident district free of charge until their 22nd birthday.

Petitioners' Appl. Ex. P-24; *see also* Petitioners' Appl. Ex. 59 at 3.

Although the language clearly states that "[t]he *Commonwealth shall* make [a] FAPE available" for eligible children with disabilities until their 22nd birthdays, *id*. (emphasis added), the Department delegated the responsibility for providing a FAPE *to the school districts*, including Petitioners. *See* 22 Pa. Code § 14.102(b). The Department mandates that each school district "shall develop and implement a special education plan" that the Department reviews, approves, and oversees. *See* 22 Pa. Code §§ 14.102(a)(4), 14.104. In the State Plan, the Department assured the USDE that Pennsylvania school districts comply with its Model Policy and provide a FAPE to children with disabilities in accordance with

the IDEA and the USDE's Regulations. *See* Petitioners' Appl. Ex. P-56 at 1-2. Only school districts, like Petitioners, that agree to and operate in compliance with the Model Policy may receive a portion of the federal funding the Department gets from the USDE. *See* Stipulations ¶ 37. Those school districts that do not may be subject to an enforcement action and presupposes that the Department will not pass federal funds on to them. *See id.*; *see also* Petitioners' Appl. Exs. P-23 at 33, P-56 at 33. Notwithstanding whether school districts seek federal funding, the New Age-Out Plan is a blanket rule that affects all school districts by mandating that they all "*shall* make [a] FAPE available to a child with a disability eligible under [the] IDEA until the student turns 22" – either at their own expense or subsidized with federal funding. Petitioners' Appl. Ex. P-24; *see also* Petitioners' Appl. Ex. 59 at 3. Accordingly, this Court finds the New Age-Out Plan's plain language has the force and effect of law and, thus, creates a binding norm.

b. Implementation

The Department bases its authority to implement the New Age-Out Plan on its desire to comply with Section 1412(a)(1)(A) of the IDEA to ensure its ongoing eligibility for federal funding. Indeed, the Department anticipated changes to the Model Policy, stating therein:

> This current [Model Policy] is formatted to facilitate future modifications of the policies and procedures. Modifications to the [Model Policy] may be necessary to ensure compliance with Part 300 [of the USDE's Regulations], if: (1) [t]he provisions of the IDEA or the implementing [USDE R]egulations are amended; (2) [t]here is a new interpretation of the IDEA by [f]ederal or [s]tate courts; or (3) [t]here is an official finding of noncompliance with [f]ederal or [s]tate law or regulations.

34

Petitioners' Appl. Ex. P-23 at 2. Neither changes to the IDEA nor the USDE's Regulations called for the Department to implement a New Age-Out Plan, nor has there been an official finding by the USDE that the Department has failed to comply with federal law. Rather, the USDE has repeatedly approved the Department's State Plan that included the Age-Out Plan.

Although some federal courts may have reinterpreted Section 1412(a)(1)(A) of the IDEA,[35] there does not appear to be any immediacy for the Department to reinterpret Section 1412(a)(1)(A) of the IDEA. Further, the IDEA does not convey authority on the Department to promulgate new regulations without complying with the CDL's and the RRA's formal rulemaking procedures. In fact, the IDEA mandates that changes to the State Plan and Model Policy must be put to a public hearing process. *See* Sections 1232d(b)(7) and 1412(a)(19) of the IDEA, 20 U.S.C. §§ 1232d(b)(7) (A state application for federal funds shall provide reasonable opportunities for the participation by local agencies, representatives of the class of individuals affected by each program and other interested institutions, organizations, and individuals by consultation with interested groups, public hearings with adequate notice, and opportunity for comment.); 1412(a)(19) ("Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the [s]tate ensures that

---

[35]     [The Department's] interpretation and advice is founded upon compelling legal developments. [] [T]hree circuit courts to have considered this issue have analyzed the language of the word "inclusive" in [the] IDEA and all three have held that the addition of the word "inclusive" means that [a] FAPE must be provided until the last day of a student's 21st year, as articulated in [the Department's] Model Policy. *See A.R. v. Conn*[.] *State Bd. of Educ.*, 5 F.4th 155, 1157-58 (2d Cir. 2021); *E.R.K. ex rel. R.K. v. Haw*[.] *Dep't of Educ.*, 728 F.3d 982, 986 (9th Cir. 2013); *K.L. v.* [*R.I.*] *Bd. of Educ.*, 907 F.3d 639, 641 (1st Cir. 2018).

Department Br. in Support of Department's Appl. at 9.

there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.").

To correspond with Section 300.165 of the USDE's Regulations, the Department also represents in Section 300.165 of the Model Policy and the State Plan:[36]

> [The Department's] policy and procedures are that prior to the adoption of any policies and procedures needed to comply with IDEA-B (including any amendments to those policies and procedures), the [s]tate conducts public hearings, issues adequate notice of the hearings, and provides an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.
>
> These procedures are conducted consistent with the public participation requirements of [Section 1232d(b)(7) of the IDEA].

Petitioners' Appl. Exs. P-23 at 46, P-56 at 46. According to Sections 300.167 of the Model Policy and State Plan, the Department also "has established an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities[,]" *id*., whose duties include, *inter alia*, "[c]ommenting publicly on any rules or regulations proposed by the [s]tate regarding the education of children with disabilities . . . [and] [a]dvis[ing] [the Department] in developing and implementing policies relating to the coordination of services for children with disabilities." Section 300.169 of the Model Policy and State Plan, *id*. at 47. Notwithstanding the Department's recognition that changes to its enforceable policies and procedures should be made after advisory panel and public participation, and its history of promulgating Section 11.12 of its Regulations in

---

[36] The Department's 2023 Model Policy revision changed Section 300.165 of the Model Policy and, by extension, the State Plan. *See* Petitioners' Appl. Exs. P-23, P-24, P-56, P-59.

36

accordance with the CDL and RRA, the Department did not submit the New Age-Out Plan to those processes.

This Court observes that the Age-Out Plan has long been set forth in Section 1301 of the School Code and Section 11.12 of the Department's Regulations. For decades, both the statutory and regulatory provisions stated that eligible children with disabilities may continue to receive a FAPE until the end of the school year in which they turned 21. *See* 24 P.S. § 13-1301; 22 Pa. Code § 11.12. The Department also included the Age-Out Plan in its BECs, its Model Policy, and its USDE-approved State Plan. Petitioners complied with the Age-Out Plan and were entitled to federal funding.

On August 30, 2023, based solely on the Settlement Agreement that settled a federal lawsuit to which Petitioners were not parties, the Department agreed to "rescind and cease implementing and enforcing the [Age-Out Plan] as it exists in Section 300.101 of it [Model Policy]." Petitioners' Appl. Ex. P-3 at 2. That same day, without notice to Petitioners - the Department implemented the New Age-Out Plan by revising the Model Policy - and, by incorporation, the State Plan - and issuing the Notice Letter, the Penn Link Communication, and the BEC, therein making the New Age-Out Plan effective no later than September 5, 2023. This Court acknowledges that it affords the Department great deference in interpreting the statutes it is charged to administer, and its interpretations have controlling weight unless they are plainly erroneous or are inconsistent with the statute. *See Corman*. Here, however, the Department extended the period under which a child with disabilities may be entitled to a FAPE beyond the end of the school year in which the child turns 21, which expands upon the School Code's meaning[37] and, thus,

---

[37] Notably, the School Code does not contain the term "inclusive" like Section 1412(a)(1)(A) of the IDEA. 20 U.S.C. § 1412(a)(1)(A).

effectuated a substantive change to the School Code and the Department's Regulations.

In addition, as stated above, statements of policy "merely express an agency's tentative, future intentions." *Nw. Youth Servs.*, 66 A.3d at 311. They "ha[ve] no immediate effect." *Transp. Servs.*, 67 A.3d at 155. Here, because the purported statement of policy "is not an announcement of future intent but, instead, of current rules, [and it has immediate effect,] it appears less like a statement of policy and more like a binding norm." *Eastwood*, 910 A.2d at 147.

> We realize that, as in many other regulatory settings, the General Assembly has delegated an enormous task to [the Department], . . . [and] there is a legitimate and essential role for [it] to offer guidance through non-legislative documents. Moreover, we are sensitive to the [Department's] concerns arising out of the federal [funding] . . . . Nevertheless, the [l]egislature did not wholly relieve the Department of compliance with all of the formalities attending legislative rulemaking in the [special education] arena[.]

*Nw. Youth Servs.*, 66 A.3d at 316.

c. Discretion

This Court has explained:

> A statement of policy, which announces a "tentative" intention for the future, "tracks a statute and does not expand upon its plain meaning."[38] *Groce v. Dep[']t of*

---

[38] The same tracking requirement applies to *guidelines* and *interpretations*:

> *Guideline*--A document, other than an adjudication, interpretation[,] or regulation, which announces the policy an agency intends to implement in future rulemakings, adjudications[,] or which will otherwise guide the agency in the exercise of administrative discretion. The document may not amend, repeal[,] or suspend a published regulation or otherwise effectively circumscribe administrative choice, but shall establish a framework within which

*Env*[*'t*] *Prot*[.], 921 A.2d 567, 578 (Pa. Cmwlth. 2007).  A pronouncement that leaves the agency with discretion to deviate from its terms can be held to be a statement of policy, not a regulation.  *Home Builders Ass*[*'*]*n of Chester*, 828 A.2d at 451.

*Transp. Servs.*, 67 A.3d at 155.

---

an agency exercises administrative discretion. . . .   The term includes, but is not limited to:

> (i) Plans for agency operation and administration which establish important policies to be utilized in the future exercise of administrative discretion.

> (ii) General policies and plans for the award and administration of discretionary grants of public monies.

> (iii) Announcements of principles and standards to be applied in future adjudications.

*Interpretation*--A statement of policy, other than a guideline, which is issued by an agency without reliance upon express or implied rulemaking authority, or which is issued by an agency which does not have express or implied rulemaking authority with regard to the matters covered by the document.  The document may not amend, repeal[,] or suspend a published regulation.  If it is unclear whether an agency intended to rely upon rulemaking authority in adopting a document, a document with substantial impact upon the public shall be classified as a regulation, rather than an interpretation.  The term includes, but is not limited to:

> (i) Explanations or interpretations of agency regulations.

> (ii) Procedures governing applications, awards[,] and administration of discretionary grants of public monies.

> (iii) Generalized rulings announcing an interpretation of law or regulation to be applied in future adjudications or other administrative actions.

> (iv) Explanations or interpretations of statutes or regulations over which the agency does not possess rulemaking authority.

1 Pa. Code § 1.4.

Here, as stated above, the New Age-Out Plan expands upon Section 1301 of the School Code and Section 11.12 of the Department's Regulations by extending the age up to which children with disabilities shall be entitled to a FAPE,

> and nothing in the [IDEA, the School Code,] or the[ir] derivative regulations persuades us that the policy shift manifested in the [New Age-Out Plan spurred only by the Settlement Agreement] can be fairly denominated as a mere interpretation of pre[]existing legislative rules.

*Nw. Youth Servs.*, 66 A.3d at 316. Moreover, the State Plan, which incorporates the Department's Model Policy by reference, is the USDE-approved document pursuant to which the Department receives federal funding. It eliminates the Department's discretion to fund LEA special education plans that do not extend a FAPE to children with disabilities until their 22nd birthdays. Accordingly, based on the limits of the Department's discretion, this Court holds that the New Age-Out Plan is a binding norm.

Observing that "[c]hallenges to the procedural validity of non-legislative rules have proliferated with the burgeoning use of guidance documents by administrative agencies to advance policy aims[,]" *Id.* at 314, the *Northwestern Youth Services* Court clarified:

> If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or [s]tate permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'
>
> [*Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015,] 1021 [(D.C. Cir. 2000)] (citing Robert A. Anthony, *Interpretive Rules, Pol*[']*y Statements, Guidances,*

> *Manuals, [&] the Like - Should Fed*[.] *Agencies Use Them*
> *to Bind the Pub*[.]*?*, 41 DUKE L.J. 1311, 1328-29 (1992)).
> *See generally* John F. Manning, *Nonlegislative Rules*, 72
> GEO. WASH. L.REV. 893, 893 (2004) ("If a purported non[-
> ]legislative rule has operative characteristics that only a
> legislative rule can legitimately possess, courts will not
> hesitate to invalidate that rule on the ground that the
> agency did not use proper procedures to adopt it.").

*Nw. Youth Servs.*, 66 A.3d at 315; *see also Transp. Servs.*, 67 A.3d at 154 ("If an interpretative rule or statement of policy functions as a regulation, then it will be nullified due to the agency's failure to obey the processes applicable to the promulgation of a regulation."); *Borough of Bedford*, 972 A.2d at 63 ("[I]f a statement of policy is actually an unpublished regulation in disguise, it will be nullified due to the agency's failure to obey the processes applicable to a regulation."). Ultimately, a regulation not promulgated pursuant to the CDL and the RRA is void *ab initio*. *See Corman*; *see also Germantown Cab Co. v. Phila. Parking Auth.*, 993 A.2d 933 (Pa. Cmwlth. 2010), *aff'd*, 36 A.3d 105 (Pa. 2012).

Based on the foregoing, the New Age-Out Plan is a binding regulation with the effect of law and, thus, the Department had to promulgate it through formal rulemaking notice and comment requirements pursuant to the CDL and the RRA. Because the Department did not do so, the New Age-Out Plan is void *ab initio* and unenforceable.[39]

---

[39] This Court does not decide whether the New Age-Out Plan is necessary for the Department to comply with the IDEA, just that the Department must promulgate the change in accordance with the CDL and the RRA.

41

## Conclusion

Because there are no issues of material fact, and Petitioners' right to relief is clear, Petitioners' Application is granted, and the Department's Application is denied.

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania School Boards :
Association, Inc., School District of :
Pittsburgh, Central Bucks School :
District, and Upper Darby School :
District, :
                Petitioners :
                 :
         v. :
                 :
Dr. Khalid N. Mumin, Secretary of :
Education of the Pennsylvania :
Department of Education, and the :
Pennsylvania Department of Education, :   No. 409 M.D. 2023
            Respondents :

## O R D E R

AND NOW, this 16th day of May, 2024, the Pennsylvania School Boards Association, Inc.'s, School District of Pittsburgh's, Central Bucks School District's, and Upper Darby School District's Application for Summary Relief is GRANTED.

Dr. Khalid N. Mumin, Secretary of Education of the Pennsylvania Department of Education's and the Pennsylvania Department of Education's Application for Summary Relief is DENIED.

_____
ANNE E. COVEY, Judge